PEOPLE v. WATKINS

Opinion of the Court

1. Homicide—First-Degree Murder—Deliberation—Premeditation
   —Time.

   Murder in the first degree is a killing of another which is de-
   liberate and premeditated, but the length of time before the
   act when the purpose to kill another was deliberately formed
   and the act premeditated is unimportant; it is enough that
   the purpose was deliberately formed and preceded and induced
   the act (MCLA § 750.316).

2. Homicide—First-Degree Murder—Deliberation—Premeditation
   —Evidence—Inferences.

   Deliberation and premeditation, elements of the crime of first-
   degree murder, can be proved by inference from evidence
   showing the character of the weapon used, the wound inflicted,
   and the circumstances surrounding the killing (MCLA § 750-
   .316).

3. Homicide—First-Degree Murder—Evidence—Sufficiency.

   The appellate court, in determining whether there was sufficient
   evidence presented at trial to warrant an instruction to the
   jury on first-degree murder, must take the state's evidence
   as true and view it in the light most favorable to the state
   giving the prosecution the benefit of every reasonable in-
   ference to be drawn from its evidence (MCLA § 750.316).

4. Homicide—First-Degree Murder—Evidence—Sufficiency.

   The evidence produced by the prosecution, viewed in the light
   most favorable to it, was sufficient to warrant submission to

---

References for Points in Headnotes

[1, 2, 6, 7] 40 Am Jur 2d, Homicide § 52.
[3, 4] 40 Am Jur 2d, Homicide § 425 et seq.
[5] 40 Am Jur 2d, Homicide § 44.
[8–10] 40 Am Jur 2d, Homicide § 265 et seq.
[11] 53 Am Jur, Trial § 1033.

the jury of the issue of first-degree murder where the two witnesses upon whose testimony the case was submitted stated that there was no evidence of animosity between the defendant and the victim, and that after the witnesses had retired to an adjoining bedroom and while they were engaged in an act of sexual intercourse, the defendant came into the bedroom and told them to get the victim before he killed him, left the bedroom, and then a short time later came back and reported that the victim had been cut, and where the record shows that the defendant had stabbed the victim with a butcher knife (MCLA § 750.316).

DISSENT BY LEVIN, J.

5. HOMICIDE—FIRST-DEGREE MURDER—STATUTES—COMMON-LAW OFFENSE.

*First-degree murder is a statutory offense, the common-law offense of murder with the added element that the murder is "willful, deliberate, and premeditated" (MCLA § 750.316).*

6. HOMICIDE—FIRST-DEGREE MURDER—DELIBERATION.

*What is done on sudden impulse or hastily is not done deliberately within the meaning of the statute defining first-degree murder (MCLA § 750.316).*

7. HOMICIDE—FIRST-DEGREE MURDER—DELIBERATION—PREMEDITATION—EVIDENCE.

*Evidence that a homicide occurred during an affray whose nature would not permit cool and orderly reflection is insufficient to warrant submission to the jury of the issue of first-degree murder since it would not support a finding that there was deliberation and premeditation (MCLA § 750.316).*

8. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—EVIDENCE—SUFFICIENCY—DEADLY WEAPON.

*The use of a deadly weapon in a homicide is not alone sufficient evidence of premeditation to warrant submission to the jury the issue of first-degree murder (MCLA § 750.316).*

9. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—EVIDENCE—SUFFICIENCY.

*Evidence that a homicide was committed with a deadly weapon is insufficient to establish the element of premeditation necessary to submit to the jury the issue of first-degree murder where there is no evidence of other circumstances showing motive or plan which would make reasonable the inference that*

the use of the deadly weapon was not a spur-of-the-moment decision, but rather that it was acquired or positioned with the thought beforehand of using it to kill the victim (MCLA § 750.316).

10. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE—SUFFICIENCY.

The evidence produced by the prosecution, viewed in the light most favorable to it, was insufficient to warrant submission to the jury of the issue of first-degree murder where the two witnesses upon whose testimony the case was submitted stated that there had been no evidence of animosity between the defendant and his victim but that after the witnesses had retired to an adjoining bedroom and while they were engaged in an act of sexual intercourse the defendant came into the bedroom and told them that they had better get the victim before he killed him, left the bedroom, and then seconds later came back and reported that the victim had been cut, nothing in the record would support a finding that the defendant had deliberated and reflected in a cool state of blood upon a decision to kill the victim even though the evidence showed that he stabbed the victim with a butcher knife, and the first statement he made to the witnesses does not evidence an intention both premeditated and deliberated upon, to kill the victim, but rather a desire to prevent the killing (MCLA § 750-.316).

11. NEW TRIAL—HOMICIDE—MURDER—INSTRUCTIONS TO JURY—COMPROMISE VERDICT—EVIDENCE.

Defendant's conviction of second-degree murder should be reversed and he should be entitled to a new trial where he was charged with first-degree murder and the jury was instructed on that charge but returned a verdict of guilty of second-degree murder and where the evidence submitted by the prosecution would not support a finding of deliberation and premeditation, thus making the instruction on first-degree murder unwarranted and the possibility of a compromise verdict non-excludable (MCLA §§ 750.316, 750.317).

Appeal from Muskegon, Charles A. Larnard, J. Submitted Division 3 May 4, 1971, at Grand Rapids. (Docket No. 9650.) Decided October 19, 1971. Leave to appeal granted, 386 Mich 782.

DeShorn Watkins was convicted of second-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Paul M. Ladas,* Prosecuting Attorney, and *Lawrence R. Backofen,* Assistant Prosecuting Attorney, for the people.

*Carl S. Krueger,* for defendant on appeal.

Before: R. B. BURNS, P. J., and HOLBROOK and LEVIN, JJ.

HOLBROOK, J. In a trial before a jury defendant DeShorn Watkins was tried for the crime of first-degree murder[1] and convicted of second-degree murder.[2] He was sentenced to prison for a term of from 10 to 15 years. He states one issue on appeal as follows:

Did the trial court err in failing to grant a motion to dismiss the charge of first-degree murder and later in instructing the jury on the offense of first-degree murder in view of the evidence in this case?

On the evening of December 31, 1969, defendant and Crawford Crowell had attended a social gathering in Muskegon Heights with two or three other persons, including Dora Kirks.

There had been some drinking of beer by the men. Earlier defendant and Crowell had been drinking wine at Crawford Crowell's house. Sometime after 11 p.m. defendant left with Crawford Crowell and Dora Kirks to go to defendant's apartment. On the way they met Larry Kirk, the deceased, and Arnold Penn who were invited to accompany them to defendant's apartment. After arriving at defendant's

---

[1] MCLA § 750.316 (Stat Ann 1971 Cum Supp § 28.548).
[2] MCLA § 750.317 (Stat Ann 1954 Rev § 28.549).

apartment they entertained themselves by talking and listening to some records. The men engaged in drinking beer and whiskey and Dora Kirks had one beer. For a period of time defendant was demonstrating karate to Larry Kirk. Arnold Penn fell asleep in a chair in the living room. Then defendant and Kirk went to the bathroom and they were apparently in a jovial mood. Shortly before they returned to the living room, Crawford Crowell and Dora Kirks retired to the bedroom. She testified the door was left slightly ajar and he testified he closed it. They engaged in an act of sexual intercourse. After a short time, according to Dora Kirks, the defendant came and opened the bedroom door and said "you better come and get this mother * * * before I kill him".

Both Dora Kirks and Crawford Crowell testified that at this time their act of intercourse was not completed. Later defendant came back again and said he had cut him or something. At that time Crowell got up and dressed and went out into the living room where he observed that the deceased had been cut with a knife. It was established that the weapon (knife) had been out in the kitchen. Dora Kirks, at the sight of blood, said she felt faint and she was told she could leave and she left.

Dora Kirks and Crawford Crowell testified that they did not notice any animosity between defendant and the deceased during the course of the night except for the two times when defendant came to the bedroom and made the remarks stated.

That night before the police arrived, defendant told Crowell that a guy came into the apartment and got into it with Kirks and cut him and then ran out.

In 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), First-Degree Murder, § 1638, p 1972, the author states:

"To constitute murder in the first degree the killing must have been deliberate and premeditated, but the length of time before the act when this purpose was deliberately formed and the act premeditated is unimportant. It is enough that the purpose was deliberately formed, and preceded and induced the act."

In the case of *People* v. *Lem Dumas* (1970), 25 Mich App 173, 174, our Court stated:

"Defendant contends that there was no direct evidence produced at trial to sustain a verdict of either first- or second-degree murder. We disagree.

"Deliberation and premeditation, which would have been necessary to prove first-degree murder, could have been inferred from the character of the weapon used, the wound inflicted, and the circumstances surrounding the killing. *People* v. *Bauman* (1952), 332 Mich 198, 205; *People* v. *Wolf* (1895), 95 Mich 625, 629. Since there was ample evidence for the jury to find murder in the first or second degree, it was properly a jury question; thus, there was no reversible error in allowing the question to go to the jury."

In determining whether or not there was sufficient evidence present in the case to submit to the jury an instruction on first-degree murder, we follow the rule set forth in the case of *People* v. *Livermore* (1967), 9 Mich App 47, 59:

"In passing on the motion for dismissal or nonsuit, the State's evidence must be taken as true, and viewed in the light most favorable to the State, which is entitled to the benefit of every reasonable inference to be drawn therefrom."

Dora Kirks testified in part as follows:

"*Q.* Am I correct in understanding that DeShorn Watkins came into the bedroom at the time he said this?

"*A*. Yes, he came in and said that and left.

"*Q*. He opened the door, and he came into the room and said that?

"*A*. Yes.

"*Q*. All right. Now, were you still in the act of having intercourse at this particular time?

"*A*. When he first came in?

"*Q*. When he came in and uttered those words, were you in the process of and in the act of having intercourse at this time?

"*A*. Yes, sir.

"*Q*. Now, was this the first time you had ever had intercourse with Crawford Crowell?

"*A*. Yes.

"*Q*. What is your answer?

"*A*. Yes.

"*Q*. Now, he immediately left out of the room again, is that right?

"*A*. DeShorn?

"*Q*. Yes.

"*A*. He came back in and he left out again.

"*Q*. Now, how long was he in the room?

"*A*. He just came in and told him that, and then he left back out.

"*Q*. Long enough to make one statement?

"*A*. Yes, and then he came back in and said he had cut him, and went back out.

"*Q*. Now, he came in the room and he made one statement, and immediately left the room?

"*A*. Yes.

"*Q*. Now, did he immediately come back into the room again?

"*A*. He stayed in there for awhile, and then he came back and he told Crawford that he had cut him, and then Crawford—

"*Q*. Now, just answer my questions, if you will, please. He went out of the room?

"*A*. Yes.

"*Q*. And how long before he came back in again?

"*A.* It wasn't that long.

"*Q.* How long was it?

"*A.* Just a few minutes.   He just went back out and he came back in again."

She later testified that it was seconds between the first time and the second time that defendant came to the bedroom.   She also testified as follows:

"*Q.* All right.   And was there any other conversation besides DeShorn telling Crawford Crowell to get an ambulance for Larry Kirk?

"*A.* Then I said that I had to go before I faint, and he told me that I could go, because I didn't see nothing, and I didn't hear nothing, and then Watkins told Crawford that he was going to prison.

"*Q.* And that is all you heard is a conversation between these boys to that extent?

"*A.* Yes."

Crawford Crowell testified in part as follows:

"*Q.* After you went in the bedroom, was the door closed or was it left open?

"*A.* I closed the door myself.

"*Q.* Do you know if it was tight or fastened tight?

"*A.* I closed the door all the way.   But I couldn't say whether it came out a little bit after that.

"*Q.* You don't know if it was latched?

"*A.* It was not enough crack for you to see in or out.

"*Q.* All right.   And how long were you in the bedroom?

"*A.* About 15 or 20 minutes.

"*Q.* And what were you doing in the bedroom?

"*A.* Well, having intercourse.

"*Q.* Now, could you hear anything that was going on out in the living room during this time?

"*A.* Well, you could hear some talking, but you didn't know or couldn't say what they were saying. They were talking.

\* \* \*

"*Q.* Did anyone come into the bedroom before you left the bedroom on this morning?

"*A.* Yes.

"*Q.* And who was it?

"*A.* DeShorn Watkins.

"*Q.* And you had been in there how long when he came in?

"*A.* I would say about 15 minutes. It was a pretty good while, about 15 minutes.

"*Q.* Were you all through having intercourse at the time he came in?

"*A.* No."

Crowell's account of what happened when first interrogated and his testimony at trial were not the same, and he admitted he had changed his story.

At the trial the defendant testified, in essence, that he was out of the living room and when he returned to the living room Larry Kirk held a knife and when he was asked to put down the knife challenged DeShorn Watkins to take it from him. That he, DeShorn Watkins, then went to the kitchen and picked up a butcher knife and returned with the knife holding it extended toward Larry Kirk and stated, "Give me the knife", whereupon Larry Kirk lunged at DeShorn Watkins with the knife in his hand held in a stabbing gesture and was speared upon the end of the blade held by the defendant.

We rule that the testimony produced at trial would justify a finding by the jury that defendant deliberately formed in his mind beforehand the intent to kill the deceased. As a result of this determination, we are constrained to rule, viewing the evidence in the light most favorable to the people, that the jury could also have determined that sufficient time had elapsed between the time defendant deliberately formed in his mind the intent to kill the deceased and the act of stabbing the deceased which

caused his death, to justify a finding of premeditation.

Affirmed.

R. B. BURNS, P. J., concurred.

LEVIN, J. (*dissenting*). I would reverse because there was insufficient evidence of premeditation and deliberation to justify submitting the issue of first-degree murder[1] to the jury, and, since we cannot exclude the possibility that the jury's verdict convicting the defendant of second-degree murder[2] was a compromise, the defendant is entitled to a new trial.

On New Year's Eve 1969, defendant DeShorn Watkins and Crawford Crowell dropped in on Dora Kirks and one of her sisters at the sister's home, 2309 Hoyt Street, Muskegon Heights. All four then went next door to a friend's home. Watkins and Crowell left to buy some beer and returned with two six-packs. Each drank some beer. Around midnight, Watkins, Crowell and Dora Kirks left for Watkins' home at 2804 Hoyt. On the way they encountered the victim, Larry Kirk, a first cousin of Dora Kirks, and Arnold Penn. After they arrived at the Watkins residence they played some records and the four men finished the beer and drank some whiskey. Everyone danced. Watkins and Larry Kirk began horseplaying, Watkins demonstrating karate moves to Kirk and Kirk in turn attempting to imitate the moves. The sport was good-natured, accompanied by much laughter. Watkins and Kirk entered a bathroom where they were heard talking and, according to Crowell, they were still playing and laughing.

---

[1] MCLA § 750.316 (Stat Ann 1971 Cum Supp § 28.548).
[2] MCLA § 750.317 (Stat Ann 1954 Rev § 28.549).

At this point, around 4 o'clock in the morning, Dora Kirks and Crowell retired to the bedroom leaving the door slightly ajar or closed. In the meantime Arnold Penn had fallen asleep on the couch in the living room. While Dora Kirks and Crowell engaged in sexual intercourse, Watkins and Larry Kirk returned to the living room. Their voices seemed normal, betraying no anger to either Dora Kirks or Crowell who could hear them through the bedroom door. Ten or twenty minutes[3] after Dora Kirks and Crowell entered the bedroom, Watkins pushed open the door and said something to Crowell. At this point the testimony of Dora Kirks and Crowell differs.

Dora Kirks testified that Watkins said to Crowell, "You'd better come and get this motherfucker before I kill him". A *few seconds* later Watkins returned to the bedroom and said that he had cut Larry Kirk.

Crowell testified that Watkins upon first appearing at the bedroom door said something to the effect that Larry had been cut or stabbed. A few second later he returned and said something like, "Hey, man, I ain't playing, come on the guy is hurt".[4]

---

[3] Dora Kirks said that the time interval between when she and Crowell entered and left the bedroom was about ten minutes. Crowell said it was "about 15 or 20 minutes".

[4] Although Crowell did admit he changed his story after he was first interrogated, he said he changed it long before the time of his testimony at trial and, in any event, he did not say that there was any change from the factual version which he first gave the police. He said that in an effort to protect Dora Kirks, so as not to reveal that they were in the bedroom engaged in sexual intercourse when the stabbing took place, when he was first questioned by the police he responded, "that I was sitting in the chair sleeping. And the only reason I said that I was sitting in the chair sleeping, was because I didn't want them to know that Dora Kirks was upstairs". He testified further that when the police arrived he thought the victim had been "just cut or something, but after I found out he was dead, that is when I told them the truth, that she was in the bedroom with me". Thus, while Crowell dissembled when first interrogated, he did not give the police a version of the facts inconsistent with the version of the facts which he gave at the trial.

Dora Kirks and Crowell dressed and entered the living room where they saw Larry Kirk slumped over one arm of the couch. Arnold Penn was still asleep. Watkins, who was on the phone, had telephoned for an ambulance and asked Crowell to call again. Dora Kirks, faint at the sight of blood, left. After Larry Kirk stopped groaning, Watkins laid him in Penn's lap and tried to administer mouth-to-mouth or mouth-to-nose resuscitation. Before the police arrived Watkins told Crowell another man had come and fought with Kirk and then fled after stabbing him. Two knives, one with blood on it, were found in the living room. At the trial, the defense was self-defense.

First-degree murder is a statutory offense. It is the common-law offense of murder with an added element—in this case the added element charged is that the murder was a "willful, deliberate and premeditated" killing.[5]

In *Nye* v. *People* (1876), 35 Mich 16, 18, 19, the Michigan Supreme Court rejected a jury instruction that a willful, deliberate design to take life "might be formed an instant before the act". The Court ruled that, "it is a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse". In *Nye*, the homicide occurred in a sudden affray. The victim knocked the defendant Nye down, Nye having, according to most of the witnesses, struck at him first. "Nye then stabbed him with a knife which he had in his pocket." Nevertheless, the absence of any testimony whatsoever to show that the killing was not a sudden impulse prompted the Supreme Court to rule that there was insufficient evidence to support a verdict of first-degree murder. The Court declared:

---

[5] MCLA § 750.316 (Stat Ann 1971 Cum Supp § 28.548).

"In dividing murder into degrees, its common-law qualities are not changed, but (except in special cases) the division is chiefly between cases where the malice aforethought is deliberate and where it is not. It was rightly considered that what is done against life deliberately indicates a much more depraved character and purpose than what is done hastily or without contrivance. But it is a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse.

"In the record before us there is no testimony whatever upon which a verdict of murder in the first degree could properly have been rendered, and the charge given must have misled the jury. That alternative should not have been left open to them."

It is, thus, clear from *Nye* that what is done on "sudden impulse" or "hastily" is not done deliberately within the meaning of this statute.[6]

---

[6] The majority speak of a "deliberately formed * * * intent to kill". (They say: "We rule that the testimony produced at trial would justify a finding by the jury that defendant deliberately formed in his mind beforehand the intent to kill the deceased".)

While this is subject to the interpretation that the requisite intent must be an intent which has been pondered upon, the more likely interpretation is that there is enough to convict a defendant of first-degree murder if it is established that the intent to kill was *actually* formed, as distinguished from an intent which is *implied*.

In every case of first-degree murder the intent to kill must be actual or, as was sometimes said in the older cases, "express". But every case of actual or express intent to kill is not a case of first-degree murder. To make it first-degree murder the actual or express intent must be premeditated *and* deliberated upon; "deliberate", as used in this context, means not merely an intended consequence but also an intended consequence which has been pondered and thought over while the actor is in an emotional state which permits true reflection on the enormity of the crime contemplated. The additional punishment for first-degree murder is reserved for a case where the evidence shows not only that the defendant actually intended to kill the victim but additionally that he reflected on that decision and, nevertheless, proceeded to murder the victim in cold blood.

The suggestion that in any case where the jury finds there is a "deliberately formed intent to kill" it may find the defendant guilty of first-degree murder is subject to the erroneous interpretation that the jury should find the defendant guilty of first-degree murder whenever it finds actual intent to kill and that second-degree murder is reserved only for those cases where, although there is no actual intent

Recently in *People* v. *Morrin* (1971), 31 Mich App 301, 329, 330, *leave denied* 385 Mich 775, we reviewed the Michigan case law concerning the sufficiency of evidence to establish premeditation and deliberation, and observed that time and again the Michigan Supreme Court had reversed convictions in first-degree murder cases for insufficiency of evidence and that the reversals were in cases where the homicide occurred during an affray whose nature would not permit cool and orderly reflection.[7]  We said:

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem.  As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood.  While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'"

The use of a deadly weapon is not alone sufficient evidence of premeditation.  See *Nye* v. *People, supra,* where, as previously mentioned, the defendant killed the victim with a knife "which he had in his pocket, and which was apparently one calculated to be used as a weapon".

"Where the use of a deadly weapon has been held to evidence premeditation there were other circumstances showing motive or plan which would make reasonable the inference that the use of the deadly

---

to kill, intent to kill is implied.  ("The intent to kill may be implied where the actor actually intends to inflict great bodily harm or the natural tendency of his behavior is to cause death or great bodily harm.  The common-law felony-murder rule is [another] example of implied intent." *People* v. *Morrin* [1971], 31 Mich App 301, 311.)

[7] See *People* v. *Morrin* (1971), 31 Mich App 301, 331, fn 47.

weapon was not a spur-of-the-moment decision, but rather that it was acquired or positioned with the thought beforehand of using it to kill the victim." *People* v. *Morrin, supra,* p. 333.

Recently in *People* v. *Anderson* (1968), 70 Cal 2d 15, 26, 27 (73 Cal Rptr 550, 557; 447 P2d 942, 949), the California Supreme Court, after a careful review of the case law, summed up as follows:

"The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People* v. *Thomas* [1945], 25 Cal 2d 880, 898, 900, 901 [156 P2d 7, 14]); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (Emphasis by the Court.)

In *Austin* v. *United States* (1967), 127 App DC
180, 188, 189 (382 F2d 129, 137, 139), the United
States Court of Appeals for the District of Colum-
bia Circuit held that, where the government's testi-
mony did not show any motive for killing the vic-
tim who had been in the defendant's company the
night of the homicide and there was no showing of
prior threats or quarrels from which an inference
of premeditation or deliberation might be drawn,
even though the victim .had been killed by multiple
stab wounds inflicted by a knife the defendant had
been carrying with him that night, the government's
evidence was insufficient to warrant submission of
the issue of premeditation and deliberation to the
jury:

"In homespun terminology, intentional murder is
in the first degree if committed in cold blood, and is
murder in the second degree if committed on im-
pulse or in the sudden heat of passion.  These are
the archtypes, that clarify by contrast."

In the case at bar there was no evidence of Wat-
kins' actions before the killing which would indicate
a premeditated and deliberated plan to kill Larry
Kirk.  Neither Crowell nor Dora Kirks could say
whether Watkins had a knife with him when he first
appeared at the bedroom door.  Dora Kirks testified
that there was insufficient time between Watkins'
first and second appearances at the doorway to al-
low him to leave the living room to secure a knife
from the kitchen.  On view of the evidence most fa-
vorable to the people, we must assume that Watkins
already had a knife at the time he first appeared in
the doorway and that within a few seconds he both
knifed the victim and reappeared in the doorway.

To show premeditation and deliberation, the peo-
ple rely entirely on Watkins' statement to Crowell,

on first appearing in the doorway, "You'd better come and get this motherfucker before I kill him". I emphasize that the *people* do not claim that there is any other evidence from which an inference of deliberation and premeditation could properly be drawn.

That statement, attributed by Dora Kirks to Watkins, does not evidence an intention, both premeditated and deliberated upon, to kill Larry Kirk. If anything, the statement would appear to indicate an unwillingness to harm Kirk and a desire by Watkins for Crowell's aid in preventing a killing.

The language used by Watkins in referring to Larry Kirk does not necessarily indicate animosity. The term "motherfucker" is used by some men in their everyday speech. Just as it cannot be taken as a literal comment on Larry Kirk's sexual practices, it does not appear to have been used in a pejorative sense.

Both Dora Kirks and Crowell were in agreement that the time lapse between Watkins' first and second appearances in the doorway, by which time Larry Kirk had been stabbed, was just a few seconds.[8]

---

[8] The time interval between Watkins' first and second appearances at the door of the bedroom was seconds, not minutes. The majority opinion quotes the testimony of Dora Kirks as follows:

" '*Q.* And how long before he came back in again?

" '*A.* It wasn't that long.

" '*Q.* How long was it?

" '*A.* Just a few minutes. He just went back out and he came back in again.'

"She later testified that it was seconds between the first time and the second time that defendant came to the bedroom."

I recognize that when a witness says one thing one time and something else another time the jury ordinarily is given the choice of believing one statement or the other. This is not such a case as it is apparent that Dora Kirks misspoke herself when she said "minutes" not "seconds." The *very next* question after her answer, "Just a few minutes. He just went back out and he came back in again," was the following:

"*Q.* Was it a matter of seconds or a matter of minutes?

"*A.* Seconds.

"*Q.* Seconds?

"*A.* Yes.

"*Q.* So that it was just time enough for him to go back in the living room for a few seconds, and then return?

"*A.* Yes."

A few questions later she was asked:

"*Q.* Was there time for DeShorn Watkins to have gone through the living room, across the living room, through the dining room, and into the kitchen to get a knife?

"*A.* I wouldn't know, I don't know.

"*Q.* You can't tell us whether there was enough time for that or not?

"*A.* When he came in and went back out?

"*Q.* Yes.

"*A.* No.

"*Q.* There wasn't time enough for that?

"*A.* I don't think so. It wasn't that long."

A few pages later:

"*Q.* All right. And it was just a matter of seconds between the time that DeShorn Watkins first came in the bedroom, and the time he returned?

"*A.* The second time?

"*Q.* Yes.

"*A.* Yes."

On the following page:

"*Q.* All right. So he indicated that Larry Kirk was cut the second time he came in the bedroom?

"*A.* Yes.

"*Q.* And this was just a matter of a few seconds between the time he came in the first time, and made a statement, isn't that right?

"*A.* Yes."

It is manifest that when Dora Kirks said "minutes" she meant "seconds"; this is not a case of two different statements by a witness, but rather a case of a slip of the tongue and of a clarification in the immediately following question.

Crawford Crowell said it was "seconds":

"*Q.* All right. Then what happened after that?

"*A.* After this?

"*Q.* Yes.

"*A.* Well, then he left out and he stayed out for a few seconds, and then he came back in—because when he first came in I figured—you know, he was just playing around".

Later:

"*Q.* How long was he gone between those two times, Mr. Crowell?

"*A.* Just a few seconds or two, I am not sure, it was not too long.

"*Q.* Was it a matter of seconds?

"*A.* Yes."

This is a matter of some importance because it indicates that after the defendant Watkins made the statement attributed to him by Dora Kirks (which Crowell said was not made), "You better come and get this motherfucker before I kill him", he did not have sufficient time to go and get a knife in the kitchen, as

There is nothing in this record which would support a finding that when Watkins first appeared in the doorway he had decided to kill Larry Kirk or that in the few seconds interval between his first and second appearances in the doorway, or before his first appearance, he had deliberated and reflected in a cool state of blood upon a decision to kill him. There was, therefore, insufficient evidence to support a conviction of first-degree murder.[9]

In *Morrin*, where we found there was insufficient evidence to convict the defendant of first-degree murder, we affirmed his conviction of second-degree murder and remanded for sentencing on that conviction. We said that the jury's mistaken belief that the record permitted an inference of premeditation and deliberation did not detract from the fact that there was sufficient evidence to support a finding of second-degree murder. We observed, however, that affirming a conviction for the lesser offense was permissible only where the accused person is convicted of the charged offense and it is, therefore, apparent that the verdict was not the product of compromise. In the present case, the defendant Watkins was con-

Dora Kirks herself so testified. This means that Watkins already had a knife at the time he first appeared in the doorway and that, adopting Dora Kirks' testimony tending to show that the victim had not been stabbed when Watkins first appeared at the door, within a few seconds he both knifed the victim and reappeared in the doorway.

The parties stipulated that the case would be submitted solely on the testimony of Dora Kirks and Crawford Crowell. However, even if we consider Watkins' statement at the preliminary examination that he armed himself with a knife after the victim had first brandished a knife at him, this would not permit an inference that Watkins in so arming himself did so with a formulated intention to kill the victim rather than simply to protect himself. Two knives were found at the scene. There was no evidence of hostility between Watkins and the victim, and no evidence that at some time before the knife entered the victim Watkins had resolved to kill him *and* that he deliberated and premeditated on that decision.

[9] See *People* v. *Hillman* (1956), 140 Cal App 2d 902 (295 P2d 939).

victed of second-degree murder. In such a case the possibility of compromise cannot be excluded and, therefore, the defendant is entitled to a new trial.[10]

The defendant moved for acquittal upon the completion of the people's proofs. For reasons already stated, he was entitled to a directed verdict of acquittal of first-degree murder. It does not appear that upon a new trial the people would be able to introduce additional evidence which would be sufficient to support a conviction of first-degree murder. See *People* v. *Baker* (1969), 19 Mich App 480, 484. Accordingly, on a retrial the defendant should not be tried for an offense greater than murder in the second degree.

---

[10] In the following murder cases it was held prejudicial to the defendant to submit the issue of first-degree murder to the jury even though he was convicted of a lesser offense: *People* v. *Marshall* (1962), 366 Mich 498, 501 (defendant was charged with first-degree murder and convicted of manslaughter); *People* v. *Hansen* (1962), 368 Mich 344, 353 (defendant was charged with first-degree murder and convicted of second-degree murder). Similarly, see *Leonard* v. *People* (1962), 149 Colo 360 (369 P2d 54). *Cf. Price* v. *Georgia* (1970), 398 US 323 (90 S Ct 1757, 26 L Ed 2d 300).