PEOPLE v MEIER

1. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—QUESTION OF
FACT.

It is generally a question of fact for the jury whether a defendant
premeditated the shooting of a decedent, but if there is no
evidence from which the jury could draw a reasonable infer-
ence of premeditation, then the question should not be placed
before the jury.

2. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—EVIDENCE.

Premeditation, as an element of first-degree murder, is a subjec-
tive mental state or condition or more properly, a thought
process, and therefore may only be established by deduction or
inference from the circumstances under which the killing was
committed; the mere act of killing alone, without proof of more,
will not support a finding of premeditation.

3. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—DELIBERATION
—"SECOND LOOK".

To premeditate is to think about beforehand; to deliberate is to
measure and evaluate the major facets of a choice or problem;
both premeditation and deliberation characterize a thought
process undisturbed by hot blood, and in the crime of first-
degree murder the interval between initial thought and ulti-
mate action should be long enough to afford a reasonable man
time to subject the nature of his response to a "second look".

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Homicide § 492.
Homicide: presumption of deliberation or premeditation from the
circumstances attending the killing. 96 ALR2d 1435.
[2, 3] 40 Am Jur 2d, Homicide §§ 44–48, 52.
[4] 40 Am Jur 2d, Homicide §§ 471, 472.
[5] 40 Am Jur 2d, Homicide §§ 439, 501.
[6, 8] 59 Am Jur, Witnesses § 860 *et seq.*
[7] 53 Am Jur, Trial § 82.
[9] 58 Am Jur, Witnesses § 674 *et seq.*
[10] 58 Am Jur Witnesses §§ 460, 516.
[11] 53 Am Jur, Trial §§ 780, 783.
[12] 21 Am Jur 2d, Criminal Law § 298.

4. HOMICIDE—DEGREE OF GUILT—QUESTION OF FACT.

A determination of the degree of guilt of an accused is a fact question for the trier of fact to determine under established principles: (1) premeditation can be reasonably inferred from the circumstances surrounding the killing, (2) a defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.*, one cannot instantaneously premeditate a murder, (3) a sufficient time lapse to provide an opportunity for a "second look" may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing, and (4) where it is factually clear that there is no evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

5. CRIMINAL LAW—EVIDENCE—PREMEDITATION—JURY QUESTION.

It was not error to refuse to quash a first-degree murder charge where there was evidence that decedent had gone with a companion to a bar where the defendant was, the companion knew the defendant, talked to him and was shown a gun, decedent went over to defendant to talk claiming to be defendant's cousin, defendant denied being related to decedent and told him to get away, defendant pulled a gun and shot decedent, there was conflicting testimony regarding a scuffle or argument preceding the shooting, the defendant admitted that the decedent had approached the defendant twice so that there was a time interruption in the total transaction, and defendant's friend had asked the defendant if he wanted to leave after decedent had approached defendant for the first time and defendant declined; there was sufficient time for premeditation and there was evidence to suggest that defendant deliberately and with reflection shot the decedent sufficient to submit the issue of first-degree murder to the jury.

6. CRIMINAL LAW—WITNESSES—CREDIBILITY—PROSECUTOR'S REMARKS.

An examiner normally is entitled to bring out on examination any facts which will assist the fact-finder in assessing the overall credibility of the witness and it is permissible to discredit a witness by showing a general lack of morality; it was not prejudicial error to inquire briefly why the witness was late in responding to a subpoena and to insinuate that the reason was that the witness had gone to bed after four o'clock in the morning.

7. CRIMINAL LAW—TRIAL—WITNESSES—STATEMENTS BY THE COURT.

It was not prejudicial error for a trial court to discuss with a

witness in the presence of the jury her tardiness, and tell the witness that a bench warrant for her arrest had been cancelled since by her appearance she had purged herself, where there was no objection to the statement at trial and where there was no evidence of hostility or irritation on the part of the judge that might have prejudiced defendant's case.

8. CRIMINAL LAW—PROSECUTOR'S REMARKS—WITNESSES—CREDIBILITY.

It was not error for a prosecutor in a murder trial to question a witness as to whether she had told other witnesses not to tell the authorities about the crime or else "they will get it too" where defense counsel did not raise an objection at trial and where the prosecutor was properly attacking the witness's credibility and searching to discover any bias.

9. CRIMINAL LAW—RES GESTAE WITNESSES—IMPEACHMENT—STATUTES.

Witnesses whom the people are obliged by law to call as res gestae witnesses may be impeached the same as though such witnesses had been called by the respondent (MCLA 767.40a).

10. CRIMINAL LAW—WITNESSES—ATTORNEY-CLIENT PRIVILEGE—BIAS.

The attorney-client privilege does not apply to a witness in a criminal trial where the prosecutor sought to establish only the fact of an attorney-client relationship between the witness and the defendant's attorney and not a revelation of any confidential communications between client and attorney because the prosecutor has a right to test the bias of a witness and the witness's relation to the defendant through a mutually hired attorney might have been significant in that regard.

11. CRIMINAL LAW—EVIDENCE—WITNESSES—IMPEACHMENT—INSTRUCTIONS TO JURY.

It was not error to admit testimony of an assistant prosecutor in a criminal trial regarding a res gestae witness's statement to him concerning a fear of the defendant where the witness verified the conversation with the assistant prosecutor, and where it was not offered to go to the truth of the matters asserted but was for impeachment purposes; such testimony did not go to the issue of defendant's guilt but to the issue of the credibility of the witness and, therefore, no limiting instruction to the jury was necessary.

12. CRIMINAL LAW—CLOSING ARGUMENT—PROSECUTOR'S REMARKS—REBUTTAL.

Remarks by the prosecutor in closing argument that defense counsel was changing defendant's testimony around was not

prejudicial; conviction will not be reversed where the remark was made in rebuttal to defense counsel's closing argument.

Appeal from Bay, Leon R. Dardas, J. Submitted Division 3 March 9, 1973, at Lansing. (Docket No. 12945.) Decided May 22, 1973.

John Joseph Meier was convicted of second-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Eugene C. Penzien,* Prosecuting Attorney, and *George B. Mullison,* Chief Assistant Prosecuting Attorney, for the people.

*Wayne Miller,* for defendant.

Before: DANHOF, P. J., and HOLBROOK and BASHARA, JJ.

HOLBROOK, J. Defendant was charged with first-degree murder in the homicide of one Robert J. Ryers, contrary to MCLA 750.316; MSA 28.548. The homicide was the result of a shooting that took place in a bar in Bay City on April 11, 1971. The jury found defendant guilty of second-degree murder and he was sentenced to life imprisonment. On appeal defendant raises ten assignments of error, some of which we have consolidated for brevity's sake.

I

Did the trial court's denial of defendant's motion to dismiss the charge of first-degree murder based on the claim that no evidence of premeditation was presented, violate defendant's due process rights by denying him a fair trial?

Defendant claimed below and asserts again on appeal that there was inadequate evidence of premeditation, which is an essential element in a charge of first-degree murder, and therefore he could not be tried for first-degree murder. MCLA 750.316; MSA 28.548; *People v Morrin,* 31 Mich App 301, 324, footnote 29 (1971); *People v De Ruyscher,* 29 Mich App 515, 516 (1971); *People v Marshall,* 366 Mich 498, 501 (1962). If the defendant's claim is correct the fact that he was convicted of second-degree murder is irrelevant, since the jury might have compromised between a choice of first-degree murder and second-degree murder when it returned the latter verdict. *People v Hansen,* 368 Mich 344, 353 (1962).

Whether the defendant premeditated the shooting of the decedent is generally, of course, a question of fact for the jury. 96 ALR2d 1435. If there was *no* evidence from which the jury could draw a reasonable inference of premeditation, then the question should not properly have been placed before the jury. *Morrin, supra.* These principles are not easily applied because premeditation, as an element of first-degree murder, is a subjective mental state or condition or, more properly, a thought process, and therefore may only be established by deduction or inference from the circumstances under which the killing was committed. The mere *act* of killing alone, without proof of more, will not support a finding of premeditation. *People v Potter,* 5 Mich 1, 7 (1858); 86 ALR2d 656. On the other hand, what circumstances, if shown, will constitute proof of premeditation is a question without a consistent answer, simply because no two murders, or murderers, are alike. Moreover, premeditation does not render itself to so lucid a definition that the trier of fact has a simple prem-

ise upon which to apply the facts to reach a logical conclusion.

This Court's most recent and studied attempt to bring some clarity to the confusing issue of premeditation is contained in *People v Morrin,* 31 Mich App 301, 329–330 (1971). There Judge LEVIN[1] extensively analyzed the varied elements that compose a violation of MCLA 750.316; MSA 28.548. As for premeditation and deliberation he said:

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look'."

In *Morrin* the Court found that the prosecution did not meet its burden to show premeditation where the defendant was the only witness to the killing, and he had alleged that he struck the decedent several times with tongs he used in his work after the decedent threatened to cut Morrin's throat if he did not perform an oral sexual act upon him. The Court felt it significant that there was no prior relationship between the parties that would tend to show motive, that the murder weapon was not acquired or positioned in preparation for homicide, that there was nothing in the record proving that defendant had taken the decedent to the secluded location for an illicit purpose, that the circumstances of the killing and the events preceding it were equivocal, and that Mor-

---

[1] Now a Michigan Supreme Court Justice.

rin's conduct subsequent to the assault was neither coherent nor organized enough to suggest it occupied a place in a scheme or plan deliberated and premeditated upon before the murder. Judges FITZGERALD and T. M. BURNS concurred with Judge LEVIN in the disposition of the case. Leave to appeal to the Michigan Supreme Court was denied. *People v Morrin,* 385 Mich 775 (1971).

While *Morrin* provided a scholarly exposition of the elements of first-degree murder, it did not halt disagreements on this Court when new factual circumstances in other murder cases came before us for review. In *People v Watkins,* 36 Mich App 380 (1971), this writer with the concurrence of Judge R. B. BURNS affirmed a second-degree murder conviction over the objection that the jury was improperly allowed to consider a first-degree murder charge, because allegedly there was no evidence of premeditation. In *Watkins* the defendant and decedent were at a jovial gathering in defendant's apartment, and both apparently in a friendly mood with each other throughout most of the evening. At some point defendant opened a bedroom door and told a couple of the guests in the bedroom that "you better come and get this mother * * * before I kill him". Defendant thereupon left the door opening. One of the people in the bedroom testified at one point in the trial that defendant returned minutes later, and then at a later point in the trial said defendant returned seconds later, to report that he had cut the decedent. We found at pp 388–389:

"[T]hat the testimony produced at trial would justify a finding by the jury that defendant deliberately formed in his mind beforehand the intent to kill the deceased. As a result of this determination, we are constrained to rule, viewing the evidence in the light most favorable to

the people, that the jury could also have determined that sufficient time had elapsed between the time defendant deliberately formed in his mind the intent to kill the deceased and the act of stabbing the deceased which caused his death, to justify a finding of premeditation."

Judge LEVIN dissented, citing his opinion in *Morrin, supra,* and supporting authority therein. His main objection with this writer's opinion was that he thought that the testimony showed that defendant had appeared at the doorway twice with an interval of only a few seconds in between, which he thought was an insufficient time during which there could be premeditation of murder under MCLA 750.316; MSA 28.548. Our difference of opinion with Judge LEVIN in *Watkins,* then, was primarily a disagreement over whether or not the jury could reasonably conclude from the testimony, admittedly not altogether consistent, that sufficient time had elapsed for the defendant to premeditate and deliberate the murder of the decedent. This writer does not believe there was a wide divergence of opinion about the appropriate standard to test premeditation upon in *Watkins* as it was before us then, but rather that the disagreement arose over the credibility, weight, and substance of the testimony that described the circumstances to which the standard would be applied. This view is supported by the fact that *Watkins* was affirmed by an equally divided Supreme Court, three Justices believing there was *no* evidence of premeditation, and three Justices believing that not only was there at least some evidence of premeditation, but that it was of sufficient character to allow the jury to consider the first-degree murder charge. *People v Watkins,* 388 Mich 717 (1972). Unfortunately, the division of the Supreme

Court in *Watkins* in essence echoed the disagreement existent in our own Court, so that no definite guidelines against which to weigh evidence to establish premeditation can be discerned from the Supreme Court opinions. Both sides in the Supreme Court did, at least, reaffirm the principle that premeditation can be inferred from all the surrounding circumstances.

Subsequent to *Watkins* a different panel of this Court consisting of Judges McGREGOR, FITZGERALD and QUINN decided *People v Banks,* 37 Mich App 280, 281 (1971). There defendant's conviction for first-degree murder was reversed on the grounds that the prosecutor had introduced no evidence to "prove beyond a reasonable doubt that there was premeditation and deliberation and such a lapse of time as would give the mind time to calculate the purpose and intent of the killing". The rule as briefly enunciated is fully consistent with that of prior cases.

In *People v Horn,* 41 Mich App 755 (1972) Judges R. B. BURNS and J. H. GILLIS affirmed the first-degree murder conviction of a defendant over the contention that there was no evidence of premeditation. Defendant there was observed beating the victim with a pipe across the back when asked to surrender the pipe by a witness. The witness left to hide the pipe and on returning discovered defendant stabbing the victim with a screwdriver. On request the defendant surrendered the screwdriver to the witness who then left to hide it. The defendant was thereafter seen striking the victim with a chair. When the chair broke the defendant continued to beat the victim with part of the chair. The defendant later surrendered a knife to the witness, and dragged the victim from the apartment to the furnace room, where the body was

later found in ashes. The majority held that the defendant was not so impassioned that he could not think of a method to kill the victim and dispose of the body at the same time, that evidence existed from which it could be inferred the victim was alive when he was shoved into the furnace, and the defendant was sufficiently cool enough to voluntarily surrender his varied weapons and yet continue to attack the decedent. Judge LEVIN dissented, again citing *Morrin, supra,* and supporting authorities therein, arguing that there was no prior animosity between the defendant and the victim, the weapons were "impromptu", and that the evidence of defendant's efforts to dispose of the body were irrelevant in determining whether in a cool state of blood the defendant deliberated and premeditated the victim's murder. Again, as in *Watkins,* Judge LEVIN's disagreement with the prevailing opinion seems to center on a differing view of what constituted "circumstances" from which premeditation might be inferred, rather than a dispute over the appropriate standard upon which to begin analysis of what constituted premeditation under the circumstances. It is notable that Judge LEVIN, *assuming* the victim was deceased by the time he was dragged to the furnace room, stated his unwillingness to consider the defendant's efforts to dispose of the victim's body as evidence of premeditation or deliberation. However, in *Morrin, supra,* Judge LEVIN thought it significant that Morrin's conduct subsequent to the assault was neither coherent nor organized enough to suggest it occupied a place in a scheme or plan deliberated and premeditated upon before the murder. This different treatment accorded the facts in the *Morrin* and *Horn* cases does not necessarily represent an inconsistency in Judge LEVIN's view of what constitutes premeditation. Rather,

the difference in treatment accorded the two dissimilar factual situations by Judge LEVIN seems to reflect exactly the same kind of dispute that occurred in *Watkins, supra, i.e.,* a disagreement over the credibility, weight, and substance of the testimony designed to prove or disprove the occurrence of premeditation and deliberation. Moreover, the *Horn* dissent reflects in our view the reoccurrence of that same kind of disagreement, rather than a disagreement over the appropriate *standard* upon which to test evidence of premeditation.

The most recent Court of Appeals decision to deal with the issue of premeditation is *People v Gill,* 43 Mich App 598 (1972), an opinion written by Judge LEVIN, with the concurrence of Judges McGREGOR and TARGONSKI.[2] While acknowledging that premeditation can be reasonably inferred from circumstantial evidence, the Court, relying on *Morrin, supra,* found no evidence to show that a defendant involved in a prison fight resulting in death actually premeditated the murder of the victim. Crucial to the Court's decision was the lack of the establishment of any time between a threat to kill and the actual fight resulting in the homicide that would allow a showing of premeditation. Again, we note that Judge LEVIN reaffirmed the role of post-murder conduct as an aid to establish an overall plan of which the murder was a part, which he rejected as an impermissible aid in his dissent under the facts and circumstances of *Horn, supra.*

We have briefly outlined the foregoing cases as a prelude to our own analysis of the premeditation element of first-degree murder. At the start we express complete agreement with the "second

---

[2] Former Circuit Judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23, as amended in 1968.

look" or "second thought" rule quoted above from *Morrin.* However, this rule so easily adopted is not so easily administered, as we think is evidenced by Judge LEVIN's dissents in *Horn* and *Watkins, supra.* It is notable that the rule in *Morrin* was heavily based on the prevailing opinion in *Austin v United States,* 127 US App DC 180; 382 F2d 129 (1967). Judge LEVIN in later opinions repeatedly relied on *Austin* as supporting his view of premeditation. *Austin* produced a strong dissent by Judge Danaher, who claimed the evidence was sufficient to allow a reasonable inference of premeditation, contrary to the view of the majority opinion. The disagreement in *Austin* is of surprisingly similar character to the kind of disagreement that occurred in *Watkins* and *Horn.* Cases following *Austin* in the Court of Appeals for the District of Columbia interpreting the District's first-degree murder statute demonstrate how difficult it is to agree on what kind of evidence is needed to allow a reasonable inference of premeditation. See, *e.g., Belton v United States,* 127 US App DC 201; 382 F2d 150 (1967); *Parman v United States,* 130 US App DC 188, 197–198; 399 F2d 559, 568–569 (1968); *Hemphill v United States,* 131 US App DC 45; 402 F2d 187 (1968), particularly the dissenting opinion of Judge Tamm; *United States v Sutton,* 138 US App DC 208, 217–219; 426 F2d 1202, 1211–1213 (1969). We believe difficulties arise in asserting the element of premeditation whenever courts attempt to use a very specific and exacting definition of the element and apply it to every factual situation in the same way. Witness, for example, Judge LEVIN's willingness to use post-death conduct as evidence of premeditation in *Morrin* but not *Horn, supra.* In *Austin* and subsequent Federal cases noted above the Court rejected jury instructions

that allowed consideration of whether *seconds* rather than *minutes* was a sufficient lapse of time for deliberation to satisfy the first-degree murder standard. But whether 2 minutes, or 1 minute, or 49 seconds, or less would be sufficient time is a question left unanswered, we suspect purposely so because 2 minutes, or 1 minute, or less conceivably could under some circumstances be a sufficient lapse of time for premeditation. In *Sutton,* 138 US App DC at pp 218–219; 426 F2d at pp 1212–1213, footnote 86, the Court noted a factor relied on by the Courts in *Belton, Austin,* and *Hemphill, i.e.,* whether or not the defendant carried the murder weapon as a matter of course, or as part of a plan to murder. Certainly, however, this "factor" cannot be considered a determinative aid in all or even most murder cases for the trier of fact who needs to decide if premeditation is present. Murderers are simply too imaginative in their choice of weapons to so restrict the factfinder's deliberations. See, *e.g., Horn, supra.*

Our own answer to the question of the appropriate rule to follow as to what constitutes premeditation in a first-degree murder case is not a definition. Rather, it is a reaffirmation of the role of the trier of fact in deciding the degree of guilt of an accused under the following established principles:

(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

(2) A defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder;

(3) A sufficient time lapse to provide an opportunity for a "second look" may be merely seconds, or minutes, or hours, or more, dependent on the

totality of the circumstances surrounding the killing;

(4) Where it is factually clear that there is *no* evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

Attempting to further clarify this "definition" in the past has, we believe, led to an invasion by the appellate courts into areas rightfully left to the trial court in its factfinding processes, with the diverging results we have noted in the cases cited above.

Under the above rules we are required to affirm the trial court's refusal to quash the first-degree murder charge. Here decedent and James Sievert came into Barney's Bar about 12:30 on the night of the killing. The defendant was already in the bar at the time. Sievert said he knew the defendant, talked to him a few moments, was shown a gun, and then returned to his table with the decedent. The decedent then went to talk with the defendant, claiming the latter to be his cousin. The defendant denied being related to him, and told decedent to get away. The next thing that happened, Sievert says, was that the defendant pulled out a gun and shot decedent. He said there was no scuffle or boisterous argument preceding the shooting. Two other customers testified to essentially the same events. Linda Chaput, a barmaid who had known the defendant for nine years, testified there was a lengthy argument between the deceased and defendant, that the decedent took off his shirt and challenged the defendant to a fight, there was a scuffle over the gun, and the gun went off killing the decedent. Her testimony conflicted sharply with that of the others testifying.

Both the defendant and another witness, Terry Yax, testified that the decedent had approached

the defendant *twice,* so that there was time inter-ruption in the total transaction. Yax said he asked the defendant if he wanted to leave to visit an-other bar after decedent had approached defend-ant for the first time, but the defendant declined.

It would seem that, on the basis of these circum-stances and other evidence present, there was sufficient time for premeditation to satisfy a charge of first-degree murder. While there was no evidence of a highly structured plan to kill the decedent, there was evidence that would suggest that the defendant deliberately and with reflection shot the decedent, at least sufficient evidence to submit the issue of first-degree murder to the jury.

## II

Were the statements made by the prosecutor in his opening argument prejudicial?

Defendant first objects to the prosecutor's state-ment that there would be testimony that Linda Chaput "would not say anything about the defend-ant expressing her fear for her life and the life of her children". She did admit during the prosecu-tor's examination of her that the night of the shooting she told the police investigator that she was not going to say anything because she "might end up in the river". Because of the admission, and because defense counsel at no time objected to anything said in the prosecutor's opening state-ment, there is no error.

Defendant also objects to the prosecutor's state-ment:

"We believe the proofs will show that from the ear-lier actions of the defendant with the gun when Ryers first approached him shows he was giving some consid-eration to using it. You don't pull out a gun and point

it at somebody. No doubt there was some thought of using it. The fact the defendant was carrying a gun loaded in his belt shows some conscious thought about using it if necessary. You don't need to carry a gun with bullets in to frighten somebody if that is what he intended to do."

Defense counsel again did not object to this statement at the time it was made, and even had he done so, it does not seem to be of such prejudicial character to be reversible error.

### III

Was the defendant denied a fair trial by the prosecutor's questioning of a res gestae witness as to why she didn't appear precisely at the time required by her subpoena? Did the court err by discussing with the witness in the presence of the jury her tardiness, and telling her that a bench warrant for her arrest had been cancelled since by her appearance she had purged herself of contempt?

The prosecutor questioned Linda Chaput concerning the reason why she was late at the trial and he insinuated that the reason was that she had gone to bed past four o'clock in the morning. It is not clear if the prosecutor was trying to impeach her credibility by this line of examination, or merely attempting to paint an unfavorable picture of her in the eyes of the jury. The examiner normally is entitled to bring out on examination any facts which will assist the fact-finder in assessing the overall credibility of the witness. *Wilbur v Flood,* 16 Mich 40 (1867). It is permissible also to discredit a witness by showing a general lack of morality. *People v Cutler,* 197 Mich 6, 13–14 (1917); *People v Newsome,* 30 Mich App 139 (1971). The scope of examination is ordinarily

within the complete discretion of the trial judge. *Newsome, supra; People v Roger Johnson,* 382 Mich 632, 640 (1969). While generally a trial court should refrain from allowing any extensive inquiry into collateral matters concerning a witness for the sake of trial economy and relevancy, we see no prejudicial error here in allowing the prosecutor's questions, especially since the line of questioning was only briefly pursued.

As for the trial judge's discussion of Linda Chaput's tardiness before the jury, the following colloquy took place:

"*The Court:* Linda how did you get here this morning —did you come on your own power or did the police bring you?

"*Linda Chaput:* I called a taxi-cab.

"*The Court:* The reason I am asking is that you were not here and did not advise the court the reason why and the court made a finding that they could issue a bench warrant that you be brought here as a material witness. That bench warrant is cancelled. You purged yourself by appearing voluntarily, without the necessity of an officer placing you under arrest. The only thing I am going to tell you is if, particularly in a court of law, if you feel you have an excuse, it is a valid excuse, you should notify the authorities that you are not going to appear, not just have somebody come here and say something, not even come—in fact, but a police officer didn't feel you would come in. This is not the way to handle it. You have purged yourself of contempt. I wanted the record to show it."

At no time did defense counsel object to this statement. In any case, assuming a jury instruction would cure the error here, if any, the trial court does not appear to have overstepped the bounds of judicial propriety in such a way as to prejudice the jury's view of the witness and her testimony. *People v Turner,* 41 Mich App 744

(1972). Nor was there evidence of hostility or irritation on the part of the judge that might prejudice defendant's case. *People v London,* 40 Mich App 124 (1972). We find no reversible error, therefore, in the court's statements.

## IV

Was it error for the prosecutor to question Linda Chaput, a res gestae witness, as to whether she told other witnesses not to tell the authorities about the crime or else "they will get you too?"

Defendant claims that such questioning by the prosecutor of Linda Chaput was irrelevant, immaterial, and called for a hearsay answer. However, since defense counsel did not raise this objection at trial, the issue cannot be raised on appeal. Moreover, even if properly objected to, defendant freely admits that:

"The law in Michigan is clear that the interest or bias of any witness, or his relationship towards the parties to an action, is a proper factor for consideration on the issue of his credibility. *People v Millard,* 53 Mich 63 (1884); *People v Field,* 290 Mich 173 (1939); *People v MacCullough,* 281 Mich 15 (1937)."

Clearly, the prosecutor was properly attacking the witness's credibility here, and searching to discover any bias on her part.

## V

Was it error for the trial court to declare a res gestae witness to be hostile and to allow the prosecutor to ask her if she had not told the assistant prosecuting attorney that she wouldn't talk because she might end up in the river, if the defendant's counsel was also her attorney, and if

she had ever been committed to a mental institution?

MCLA 767.40a; MSA 28.980(1) provides: "Witnesses whom the people are obliged by law to call as res gestae witnesses may be impeached the same as though such witnesses had been called by the respondent". The prosecutor, therefore, had the full right to impeach Linda Chaput like any other hostile witness. *People v Bruno,* 30 Mich App 375 (1971). Linda Chaput admitted that she made the statement that she did not want to talk because she might end up in the river. We can, therefore, see no error in that particular line of questioning by the prosecutor.

The prosecutor also asked Linda Chaput whether defendant's counsel was her attorney, over defense counsel's objections. Defendant claims that *People v Brocato,* 17 Mich App 277 (1969), bars such questioning. We see no authority in that case for anything but the rule that it is reversible error for the prosecutor to request the defendant to waive his attorney-client privilege in the presence of the jury. The prosecutor has a right to test the bias of a witness, and Linda Chaput's relation to the defendant through a mutually hired attorney might have been significant in that regard. The attorney-client privilege does not apply under these particular circumstances, since the prosecutor sought to establish only the *fact* of the relationship, not a revelation of any confidential communications between client and attorney. McCormick, Evidence (2d ed), § 90, pp 185–187; *People v Harris,* 6 Mich App 478, 480 (1967).

Finally, the prosecutor asked Linda Chaput whether she had ever been committed to Traverse City State Hospital as a mentally ill patient. Defense counsel immediately objected, but apparently

before the trial judge could respond Mrs. Chaput vociferously answered that she had been in the hospital as an alcoholic, and had "paid my debt". The line of questioning ended at this point. Obviously the prosecutor was again attempting to impeach the credibility of the witness, which he had a right to do under MCLA 767.40a; MSA 28.980(1). While evidence of past mental institutionalization may be pertinent to credibility, it might also be considered so collateral and inflammatory that it would prejudice the minds of the jury. In light of Linda Chaput's response to the question here, however, and in light of the record taken as a whole, we do not see how prejudice could have occurred here, and therefore decline to find reversible error in the prosecutor's question.

## VI

Was it error to allow the testimony of the assistant prosecutor as to a res gestae witness's statement of fear of the defendant, and to fail to instruct the jury that such evidence could be considered only as impeaching the declarant's credibility?

During the examination of Linda Chaput the prosecutor asked her whether she had told the assistant prosecutor, Jack Frost, that she wasn't going to tell him anything because she was afraid she might end up in the river, and to lock her up so she and her baby would be safe. She verified the conversation with the assistant prosecutor and also admitted that she argued with another witness at the police station about whether the witness had asked her to call the police when the defendant had first pulled a gun. Jack Frost testified to having the same conversation with Linda Chaput, and to overhearing the argument between

her and the other witness. Defendant objected to Frost's testimony claiming it was hearsay. We find no error here.

In the first place, Jack Frost's testimony did not conflict with Linda Chaput's, but in fact corroborated it. It could not, therefore, be an improper attack on her credibility. Moreover, the testimony of Frost should not have been excluded as hearsay, since it was not offered to go to the truth of the matters asserted therein, but for impeachment purposes. Furthermore, the court did properly instruct the jury with respect to the testimony of Frost about the argument between Linda Chaput and a witness at the police station, stating the evidence was only to go to Linda Chaput's credibility. As to the remaining testimony, it did not go to the issue of whether defendant had shot the decedent but to the credibility of Linda Chaput, and therefore no limiting instruction was needed. *People v Dickerson,* 30 Mich App 447, 449 (1971).

## VII

Was the prosecutor's closing argument so prejudicially improper as to deprive defendant of a fair trial?

Defendant objects for the first time on appeal to the prosecutor's discussion of Linda Chaput's supposed fears of the defendant, and to the prosecutor's remark that defense counsel was "changing defendant's testimony around". In the first place, objections not made below cannot be made for the first time on appeal. *Brocato, supra.* Secondly, defendant cites no authority or reasons why reference to Linda Chaput's supposed fears of the defendant was prejudicial or improper, and in light of her testimony at trial, we do not see any proper basis for objection. Reference to the defense attor-

ney's changing the testimony around was a re-
mark made in rebuttal of defense counsel's closing
argument, and, if error at all, was hardly prejudi-
cial. Again, defendant cites no valid reasons or
authority why the remark is so prejudicial as to be
reversible error.

Finally, defendant objected at trial and again
here that the prosecutor made improper reference
in closing argument to Linda Chaput's relationship
with defendant's attorney. For the reasons stated
previously we see no error in such a reference,
since there might be reason to find bias on the
part of Linda Chaput because of such a relation-
ship, a bias the jury would need weigh in assessing
her credibility.

Affirmed.

All concurred.