PEOPLE v. HANSEN.

1. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE.
    The submission of the issue of first-degree murder to a jury is reversible error, where there is no evidence supporting an open charge of murder (CL 1948, § 750.316).

2. SAME—MALICE.
    Malice, involved in open charge of murder, requires an intent to cause the very harm that results or some harm of the same

REFERENCES FOR POINTS IN HEADNOTES

[1]  26 Am Jur, Homicide §§ 38, 39, 284 et seq.
[2, 4]  26 Am Jur, Homicide § 34 et seq.
[3]  26 Am Jur, Homicide § 11.
[5]  26 Am. Jur, Homicide § 9 et seq.
[6]  26 Am Jur, Homicide § 554 et seq.

general nature, or an act done in wanton or wilful disregard of the plain and strong likelihood that some such harm will result in the absence of any circumstance of justification, excuse, or recognized mitigation (CL 1948, § 750.316 *et seq.*).

3. SAME—COMMON LAW—STATUTES.

Murder, under the statute, embraces every offense which would have been murder at common law and no other crime (CL 1948, § 750.316 *et seq.*).

4. SAME—INTENT.

Each grade of murder embraces some cases where there is a direct intent to take life and offenses, where the direct intent was to commit some other crime (CL 1948, § 750.316 *et seq.*).

5. SAME—DEGREES OF MURDER—INTENT.

Murder in the first degree requires the existence of a deliberate intention to take life, and any slaying in which a jury should find either the absence of deliberation, or that the intent was to commit another and a lesser injury, must be either murder in the second degree, or one of the lighter grades of homicide (CL 1948, § 750.316 *et seq.*).

6. SAME—FIRST-DEGREE MURDER—SECOND-DEGREE MURDER—CHARGE TO JURY.

It was reversible error to present for consideration of jury the issues of guilt of either first- or second-degree murder in prosecution on an open charge of murder under evidence presented showing victim of homicide, a stranger to defendant, had been shot after he had terrorized defendant and his wife at 1:30 a.m., had stated to defendant there were 2 other men waiting to take defendant out of the State whether he wanted to go or not, defendant had managed to call the police, and the evidence indicates he was acting under circumstances of excitement, pressure, and fear, there being nothing in the record to show malice aforethought, express or implied, or intent to do other than defend himself and family from prospective harm (CL 1948, § 750.316 *et seq.*).

Appeal from Muskegon; Beers (Henry L.), J. Submitted October 5, 1962. (Docket No. 81, Calendar No. 49,115.) Decided December 3, 1962. Rehearing denied January 11, 1963.

Robert George Hansen was convicted of murder in the second degree. Reversed and remanded.

*Frank J. Kelley*, Attorney General, *Eugene Kras--icky*, Solicitor General, and *Harry J. Knudsen*, Prosecuting Attorney, for the people.

*Leo W. Hoffman* and *Frederick D. McDonald*, for defendant.

Kavanagh, J. Defendant was charged with first-degree murder* of one Mitchell Stanley Wozny. The jury found defendant guilty of murder in the second degree. He was sentenced for a period of not exceeding 25 years and not less than 14 years.

Defendant is here on leave granted by this Court,. alleging 10 errors, only the first 2 of which we will discuss. These are:

1. Should the court have directed the jury to re--turn a verdict of not guilty of murder?

2. Was the verdict of the jury finding defendant guilty of murder in the second degree against the great weight of the evidence?

Defendant was working late in the darkroom of his combination home and photography studio in Muskegon, Michigan. He had been expecting a friend to call. At about 1:30 o'clock in the morning of January 4, 1958, he heard the door buzzer. He opened the outside door and was surprised to see a stranger. Without being invited, the stranger stepped into the house. Defendant offered to shake hands with him, but the intruder kept his right hand in his pocket. Defendant stated, "This is a bad time of the night to make appointments, I don't recognize you." The deceased responded that he was not sur--prised since defendant didn't know him. Deceased informed defendant he had 2 men out in the car waiting for him; that they were there to take de-

---

* See CL 1948, § 750.316 *et seq.* (Stat Ann 1954 Rev § 28.548 *et seq.*).—Reporter.

fendant to New York and set him up in a photography business, and they were going to take him whether he wanted to go or not. Deceased then informed defendant that he had a point he wanted to clear up with defendant's wife, and asked where she was. Defendant said his wife was sleeping in her bedroom upstairs. The intruder sat down at defendant's desk and, with his left hand fumbled with some papers, keeping his right hand in his pocket; he told defendant the chamber of commerce had suggested he contact defendant. Defendant asked him if he knew his wife. The intruder replied he didn't know her, but that he knew her brother who lived in Pentwater and that they were also going to see him. He then said, "Well, let's go get your wife."

Defendant tried to put the deceased off; he tried to ring his wife on an upstairs phone, but the phone didn't ring. He then told deceased he wanted a drink of water and went into the bathroom, intending to get his gun, but the deceased followed him into the bathroom, refused a drink of water and again insisted on seeing defendant's wife. Defendant then went back to his desk and again tried to call his wife on the phone. The deceased put his hand over that of defendant and said, "Let's cut out the foolishness, I want to go upstairs and see your wife right now, are we going upstairs or not." He grabbed defendant by the jacket and led him toward the front door. Defendant questioned the deceased about the 2 men in the car, as to whether they were going to get cold out there. The deceased said, "Yes, they are going to get cold and they are going to get impatient and they are going to come in here too, let's hurry this thing up." Deceased grabbed hold of defendant's arm and they proceeded upstairs. Defendant testified he was frightened and scared, but thought if he could get upstairs and warn his wife she might be able to help him.

On arriving at his wife's bedroom, defendant took his billfold containing $260 and shoved it under the mattress and then awakened his wife. He told her there were 3 men who insisted on seeing her. She asked who they were. The deceased, who was then standing behind defendant, said "That's right Mrs. Hansen, we do want to see you, I especially want to see you." He asked her if it was all right if they took her husband to New York to set up a studio. Deceased then said, "Turn on the light." But instead of turning the light on, defendant ran downstairs, grabbed the phone, and called the police, saying "1783 Sanford quick." On the way downstairs he had heard his wife scream, so he got his gun, loaded it, and ran back to the front of the house. He heard the intruder come running down the steps. He grabbed the phone again and said, "Hurry or I will fill them all full of lead." Defendant saw the intruder open the outside door and go down the steps. He ran to the door of the front porch and shouted, "Halt, or I will fire."

Defendant testified the intruder had his hand by his side; that he was afraid he would get to a safe place; and that he was apprehensive about the other 2 men. He wanted to stop the intruder, so he shot at the man's legs several times. As a result of the phone call to the police, police cruisers arrived and converged on the area, and after a short time the intruder was found lying at the back door of a neighbor's house a short distance away. He had been shot in both legs and once in the upper back, the bullet passing through the body to a point just beneath the skin of the chest.

Officer Robert Rositch testified that he and officer Inglat were sent to Laketon and Sanford; that the dispatcher told them "to go to 1783 Sanford," that there was trouble with drunks. He said, "You better hurry up, there was some shooting there."

Officer Rositch testified they went to 1783 Sanford and saw a man standing on the sidewalk yelling, and that Officer Inglat asked him what the trouble was and he said he just shot the man who broke into his house.

Defendant was taken to the police station where he made a statement of what happened. During the time the statement was being made, Wozny died of a hemorrhage from the bullet path through the right lung.

It is to be noted that without having an opportunity to discuss the matter with her husband, Mrs. Hansen, later the same morning, gave a statement substantiating his story.

There was no evidence the deceased and defendant had ever met. The defendant so testified. The nearest to any relationship between the 2 men was testimony by the sister of deceased that defendant told her during the trial, that Wozny had phoned him some months before to have her father's picture taken at the time of her father's funeral.

Mrs. Findley (a girl friend of the deceased) testified that she heard a knock on her door and when she went to the door she saw Wozny leaning against the storm door and he said, "I've been shot." He then fell over in the snow. A police car came up together with defendant, and she heard defendant say, "I'm sorry I shot you fellow, but it's a good thing I shot you in the legs."

Police officers testified they heard defendant say, "I'm sorry I shot you, it's a good thing I shot low."

Another police officer testified defendant said, "I'm sorry, fella, but I told you not to run," and "You weren't causing much trouble, but you were a nuisance, and it's lucky I'm a good shot, I shot low."

The record discloses the man was shot in both legs and once through the back and into the chest; this was apparently the fatal shot.

Defendant claims prejudicial error was committed because the jury was instructed that it could render 4 verdicts ranging from murder in the first degree, murder in the second degree, manslaughter, or not guilty, where there was no evidence of murder in the first or second degree. It is claimed there was no evidence of malice, deliberation, or premeditation sufficient to submit first-degree murder to the jury.

The prosecution freely concedes it would be error to submit first-degree murder to the jury where there is no evidence supporting an open charge of murder. They contend, however, there was some evidence and proof from which the jury could find malice, premeditation, and deliberation. The brief for the people states, "In a nutshell, the people say that the question of the amount and degree of malice, whether premeditated or not, is for the jury to determine where there is proof of malice." The people rely on the following facts as indications of malice:

1. That Hansen telephoned the police department some time before he emptied the revolver at the back of the fleeing deceased, when he said, "Hurry or I will fill them all full of lead."

2. That decedent was running away when defendant fired the shots.

3. That one of the officers testified he heard defendant say when they were near the body, "I'm sorry fella, but I told you not to run. You weren't causing much trouble, but you were a nuisance, it's lucky I'm a good shot, I shot low."

4. That after defendant emptied the weapon, he returned to the house to reload in order to deal with the situation.

Malice requires an intent to cause the very harm that results or some harm of the same general nature, or an act done in wanton or wilful disregard of the plain and strong likelihood that some such harm will result. It requires also on the negative side the

absence of any circumstance of justification, excuse, or recognized mitigation.

In the early case of *People* v. *Scott,* 6 Mich 287, Justice CAMPBELL, writing for the Court said, (pp 292–294):

"Murder under our statute embraces every offense which would have been murder at common law, and it embraces no other crime. But murder is not always attended with the same degree of wicked design, or, to speak more accurately, with the same degree of malice. It may be committed in cold blood, and with much calculation, and it may be committed on a sudden impulse of passion, where the intent is formed and executed in the heat of blood, without any sufficient provocation to extenuate the degree of the offense to manslaughter. In both of these instances, and in the intermediate cases where the design is of greater or less duration, there is the actual intent to take life.    *    *    *.

"Each grade of murder embraces some cases where there is a direct intent to take life, and each grade also embraces offenses where the direct intent was to commit some other crime.    *    *    *

"Murder in the first degree requires the existence of a deliberate intention to take life; and any slaying in which a jury should find either the absence of deliberation, or that the intent was to commit another and a lesser injury, must be either murder in the second degree, or one of the lighter grades of homicide."

The record fails to disclose any fact that would justify a conclusion that premeditation existed or that there was intent to kill. Clearly, there was no circumstance shown indicating malice aforethought; and if the jury returned a verdict of guilty of murder in the first degree, we would have set it aside as being unsupported by the evidence. See *People* v. *Marshall,* 366 Mich 498.

The very facts relied upon by the people to show evidence of malice, premeditation, and deliberation clearly would preponderate the other way. The parties had not been previously acquainted. That defendant was scared is undisputed in the record, and his actions bear this out. His frantic call to the police department, which was verified by the police sergeant, that he requested help and then returned to the phone to shout, "Hurry or I will fill them all full of lead," indicates his excitement. Officer Rositch's statement that he found defendant standing on the sidewalk yelling is indicative of his frame of mind. This, accompanied by the fact a man had forced his way into defendant's home at 1 o'clock in the morning and the fact he had heard his wife screaming, indicates he was acting under circumstances of excitement, pressure, and fear.

The undisputed evidence establishes that defendant was excited and afraid for himself and his family. He had reason to believe that Wozny intended to force him out of the house and perhaps take him to New York against his will. He had reason to believe that Wozny was possibly crazy and might kill him or his wife or children. As defendant was running down the stairs he heard his wife screaming and he had no way of knowing what was happening upstairs. Wozny could have assaulted his wife. For all the defendant knew, Wozny may have been going to get the help of the 2 men who were outside. He did not have time to stop and think calmly as to the proper course to follow. There was no time for him to become calm; and still excited and afraid he ran to the front door and shot at Wozny's legs as he ran down the street.

There is absolutely nothing in the record which could possibly establish an inference in any reasonable person's mind that the defendant shot at the

deceased with malice aforethought, either express or implied.

We conclude, then, that the charge with reference to murder ought to have been omitted and that it was reversible error for the trial court to instruct with reference to first-degree murder. See *People* v. *Stahl,* 234 Mich 569, with reference to how defendant was prejudiced by this charge when there was no evidence to support the charge. See, also, *People* v. *Gessinger,* 238 Mich 625, and *People* v. *Marshall, supra.*

We conclude, also, that there was no evidence from which malice could be inferred sufficient to justify the verdict of guilty of murder in the second degree.

We find, therefore, that reversible error was committed in submitting the charge with reference to both first-degree murder and second-degree murder.

We do not discuss the other questions raised since they are not necessary to a decision.

The conviction is reversed; the sentence is set aside; and the case is remanded for further proceedings.

CARR, C. J., and DETHMERS, KELLY, BLACK, SOURIS, and OTIS M. SMITH, JJ., concurred.

ADAMS, J., did not sit.