PEOPLE v STINSON
PEOPLE v BURTON
PEOPLE v MOORE

1. CRIMINAL LAW—ACQUITTAL—MOTION FOR DIRECTED VERDICT—EVI-
DENCE—MATERIAL ELEMENTS—EXAMINATION OF EVIDENCE.

A motion for a directed verdict of acquittal may be granted only
where there is no evidence at all, either direct or circumstan-
tial, on each material element of the offense charged; and in
the event any evidence is presented it must be examined in a
light most favorable to the prosecution.

2. HOMICIDE—SECOND-DEGREE MURDER—MALICE AFORETHOUGHT—
SPECIFIC INTENT—WILLFUL DISREGARD.

The requisite malice aforethought essential to prove second-de-
gree murder may be determined from the type and duration of
a beating as well as its severity and the nature in which it was
carried out for the establishment of the factors of specific intent
or action in wanton or willful disregard of the plain and strong
likelihood that death would result.

3. HOMICIDE—SECOND-DEGREE MURDER—MANSLAUGHTER—APPEAL
AND ERROR—OBJECTIONS—AIDING AND ABETTING—INSTRUC-
TIONS TO JURY—SPECIFIC REQUEST.

An objection, in a second-degree murder trial, that the trial court
failed in its instructions to the jury to adequately explain the
law of aiding and abetting as applied to the lesser offense of
manslaughter is not preserved for appellate review, absent
manifest injustice, where defense counsel merely objects to the

REFERENCES FOR POINTS IN HEADNOTES
[1] 75 Am Jur 2d, Trial §§ 483–485.
[2, 9] 40 Am Jur 2d, Homicide § 50.
Inference of malice or intent to kill where killing is by blow
without weapon. 22 ALR2d 854.
[3] 40 Am Jur 2d, Homicide § 507.
[4] 58 Am Jur, Witnesses § 578 *et seq.*
[5–7] 75 Am Jur 2d, Trial § 855 *et seq.*
[8] 47 Am Jur 2d, Jury § 231.
[10] 21 Am Jur 2d, Criminal Law §§ 440, 441.

giving of an aiding and abetting instruction on the grounds that the evidence was insufficient to support such a charge and there was no request to specifically relate aiding and abetting to the charge of manslaughter nor an objection to the trial court's failure to do so.

4. WITNESSES—INSTRUCTIONS TO JURY—EXTRA-JUDICIAL STATEMENTS— IMPEACHMENT—REFRESHING MEMORY.

A court is not required to instruct a jury that extra-judicial written statements made by witnesses may be used only for impeachment purposes where the witness's credibility was not in fact impeached, but rather, the statements were used to refresh his memory.

5. WITNESSES—INSTRUCTIONS TO JURY—EXTRA-JUDICIAL STATEMENTS— IMPEACHMENT—OTHER EVIDENCE—HARMLESS ERROR.

Failure of a court to instruct a jury that extra-judicial written statements made by witnesses may be used only for impeachment purposes where the witness's credibility was in fact impeached will not result in reversible error where the error was rendered harmless by ample evidence presented during the trial relating to the same information contained in the statement.

6. APPEAL AND ERROR—INSTRUCTIONS TO JURY—EXTRA-JUDICIAL STATEMENT—IMPEACHMENT— PRESERVING QUESTION.

Failure to give an instruction limiting the use of an extra-judicial statement to impeachment purposes only is not reversible error in the absence of a proper request or objection.

7. APPEAL AND ERROR—INSTRUCTIONS TO JURY—PREVIOUS INDICATIONS —REMINDER OR OBJECTION—REMEDY.

Failure of the court in its charge to the jury to give a cautionary instruction which the court had previously indicated it would give is not reversible error where no reminder or objection was registered by counsel and the error complained of could have been remedied had such an objection been made.

8. JURY—VOIR DIRE—CRIMINAL LAW—DISCOVERY—JURY SLIPS—VOT-ING RECORDS—APPEAL AND ERROR—PREJUDICE.

Discovery of jury slips prepared by the prosecution which contain the voting records of prospective jurors should not be precluded by the trial court, but the focus of appellate review will be on whether the jury which was sworn was prejudiced against the defendant; and where the record fails to disclose such prejudice, the Court will not reverse for failure to allow discovery of the slips.

9. HOMICIDE—INSTRUCTIONS TO JURY—SECOND-DEGREE MURDER—
    MANSLAUGHTER—MALICE—AFORETHOUGHT—CASE LAW.
    The trial court's instructions on malice aforethought and intent
       in a second-degree murder trial are correct and accurate where
       they comport with case law and correctly tell the jury that the
       difference between second-degree murder and manslaughter is
       the presence of malice aforethought in the former and its
       absence in the latter.

10. CRIMINAL LAW—MAGISTRATES—PRELIMINARY EXAMINATION—
    PROBABLE CAUSE—DISCRETION—ABUSE OF DISCRETION—APPEAL
    AND ERROR.
    An examining magistrate is to bind a defendant over for trial if
       the magistrate determines that an offense has been committed
       and that there is probable cause to believe that defendant
       committed it, and neither the trial court nor the Court of
       Appeals should substitute its judgment for that of the magis-
       trate, except when a clear abuse of discretion is shown.

Appeal from Recorders Court of Detroit, George
T. Ryan, J. Submitted Division 1 November 8,
1974, at Detroit. (Docket Nos. 16172, 16234, 16235).
Decided February 10, 1975. Leave to appeal de-
nied, 394 Mich 761.

Ellsworth C. Stinson, Charles Burton and Carl-
ton T. Moore were convicted of manslaughter, and
Stinson was also convicted of attempted sodomy.
Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Dominick R. Carno-
vale,* Chief, Appellate Department, and *Robert A.
Reuther,* Assistant Prosecuting Attorney, for the
people.

*Carl Ziemba,* for defendants on appeal.

Before: J. H. GILLIS, P. J., and ALLEN and PETER-
SON,* JJ.

* Circuit judge, sitting on the Court of Appeals by assignment.

ALLEN, J. Each of the defendants was charged with second-degree murder, MCLA 750.317; MSA 28.549, and Stinson was also charged with sodomy. MCLA 750.158; MSA 28.355. A jury found each guilty of manslaughter, MCLA 750.321; MSA 28.553, and Stinson also guilty of attempted sodomy. Moore received a sentence of 5 to 15 years in prison; Burton was sentenced to 7-1/2 to 15 years; and Stinson was sentenced to 10 to 15 years on the manslaughter conviction and 3-1/3 to 5 years on the attempted sodomy conviction. Defendants appeal.

Initially, defendants argue that the trial court erred in denying their motions for directed verdict of acquittal on the second-degree murder charge. MCLA 750.317; MSA 28.549. According to *People v Hodo,* 51 Mich App 628, 639; 215 NW2d 733 (1974), such a motion may be granted only where:

"there is no evidence at all, either direct or circumstantial, on each material element of the offense charged. In the event the requisite evidence is presented, it is submitted to the trier of fact for a determination of whether such evidence established guilt beyond a reasonable doubt." (Omitted citations.)

We must examine the evidence in a light most favorable to the people to determine whether the charge of second-degree murder was properly submitted to the jury. *People v Watkins,* 36 Mich App 380, 385; 193 NW2d 914 (1971), *aff'd,* 388 Mich 717; 202 NW2d 780 (1972). We commence our examination by stating the elements of second-degree murder.

According to 3 Gillespie, *Michigan Criminal Law and Procedure,* § 1639, p 1973:

"To constitute murder in the second degree there

must be an unlawful killing and a purpose to kill, formed suddenly, preceding and accompanying the act, without that deliberation and premeditation which distinguishes murder in the first degree, but not such sudden provocation and stirring of the passions which precludes the exercise of reason, as would, in a legal sense, exclude the idea of malice aforethought, and thereby reduce the homicide to manslaughter."

Murder "is an unlawful, malicious killing", and malice aforethought is an essential element of second-degree murder. *People v Carter,* 387 Mich 397, 416–418; 197 NW2d 57 (1972). According to *People v Morrin,* 31 Mich App 301, 310–311; 187 NW2d 434 (1971), *lv den,* 385 Mich 775 (1971):

"Malice aforethought is the intention to kill, actual or implied, under circumstances which do not constitute excuse or justification or mitigate the degree of the offense to manslaughter. The intent to kill may be implied where the actor actually intends to inflict great bodily harm or the natural tendency of his behavior is to cause death or great bodily harm." (Footnotes omitted.)

Homicides which are "unplanned or impulsive" or committed "in the sudden heat of passion", and which are intentional and committed with malice aforethought are murder in the second degree. *Austin v United States,* 127 US App DC 180; 382 F2d 129, 137 (1967). See also *People v Vail,* 49 Mich App 578, 591; 212 NW2d 268 (1973), *lv granted,* 391 Mich 789 (1974).

*People v Hansen,* 368 Mich 344, 350–351; 118 NW2d 422 (1962), noted that malice required either an intent to cause the specific harm that resulted;

"or some harm of the same general nature, or an act

done in wanton or wilful disregard of the plain and strong likelihood that some such harm will result."

Pursuant to the above, *People v Geiger,* 10 Mich App 339, 343; 159 NW2d 383 (1968); *lv den,* 381 Mich 753 (1968), said "an assault by blows without a weapon may, under certain circumstances, permit a jury to infer an intent to kill". (Omitted citations.) This inference is a permissible one, *People v Martin,* 392 Mich 553, 561; 221 NW2d 336 (1974), and may arise "from the totality of the circumstances". *People v McBride,* 30 Mich App 201, 203; 186 NW2d 70 (1971). See also *People v Person,* 20 Mich App 246, 249; 174 NW2d 67 (1969). The type and duration of a beating, as well as its severity and the nature in which it was carried out are factors which a jury may examine to determine "that defendant knowingly committed an act which led to the result intended". *People v McFee,* 35 Mich App 227, 232; 192 NW2d 355 (1971), *lv den,* 388 Mich 763 (1972).

Having defined the elements of murder of the second degree we now turn to examine the evidence applicable to each defendant, and to determine whether the charge was properly submitted to the jury.

Initially, we note that medical testimony was presented which indicated that the deceased suffered from a subdural hemorrhage which resulted from an injury to the brain. In the doctor's opinion, this damage to the brain was caused by a "blunt force injury", and that possibly the striking of deceased's head with fists caused that injury. Medical evidence was also received that at the time deceased was admitted to Detroit General Hospital, he was diagnosed as having suffered a subdural hematoma approximately 24 to 48 hours previous to his admission. While the doctor was

unable to state exactly when this injury occurred, and although defense counsel argued that the evidence raised a question as to whether deceased had entered the jail cell with this condition already existing, we find that the evidence was sufficient to go to the jury on the question of cause of death.

On June 8, 1972, Harold Cross, age 21, having been arraigned earlier in the traffic and ordinance division of Detroit Recorder's Court, entered ward 218 of the Wayne County jail. Among the other persons confined therein were defendants Stinson, Moore and Burton. During the evening of June 8, and the afternoon and evening of June 9, Cross was subjected to various assaults by each defendant. At approximately 11 p.m. on the evening of June 9, Cross was taken from ward 218 to Detroit General Hospital, where he never regained consciousness and where he died on June 11, 1972.

*Evidence Against Stinson:* Samuel Kleckley, an inmate in ward 218, testified that Stinson and Cross initially began "joking around" and exchanged a few slaps. Apparently Stinson slapped Cross, Cross returned the slap, and Stinson struck Cross again. Apparently, one thing led to another, and Kleckley then saw Stinson kicking at Cross, and Cross began to seek refuge under one of the bunks. Other inmates in the cell block had to pull Stinson away. Cross came out from underneath the bunk, stumbled, hit his head against the bars, and was placed in his bunk by other inmates. He got up again, stumbled, and returned to his bunk. He remained there until he was carried to Detroit General Hospital.

Ernest Lockett, another inmate, said that Stinson had accused Cross of being employed by the police. He also testified that he heard Stinson tell

Moore to "be cool or I will kill the dude". Lockett also testified as to a towel beating incident, in which Stinson beat Cross with a wet, knotted towel for about five minutes.

Walter Kaminski, a fellow inmate, testified that as soon as Cross entered the ward, all three defendants began to talk to him, and after dinner Cross and defendants were singing together. On that first day, Stinson had slapped Cross. On the next day, the beating with wet towels occurred, and Stinson began to beat Cross with his fists. He also kicked him, and this lasted for about ten minutes. Kaminski testified to the incident in which Cross had sought refuge underneath his bunk where Stinson kept kicking him in the legs. Kaminski testified that later that evening Stinson beat Cross again, with Cross running around trying to avoid the beating. Stinson was striking Cross with his fists and kicking him, and was throwing shoes at him. After Cross fell to the floor, Stinson kept hitting and kicking him. Stinson never quit, and Burton and Moore had to pull him off.

Ronald Bousquette, another inmate, testified that after breakfast on the second day, June 9, Stinson and Burton began to beat Cross, and also testified about the towel beating incident. Bousquette also testified about the beating which resulted in Cross lying on the floor underneath his bunk and with Stinson continuing to kick him. Bousquette testified that Stinson beat Cross with his fists and feet and had knocked Cross to the floor. Stinson continued to kick Cross once Cross was on the floor. He said that Stinson had picked up a shoe and beat Cross with it while Cross was trying to get underneath the bunk.

*Evidence Against Moore:* Lockett testified that

Moore, nicknamed "Duck", hit Cross in the face with his fist about three or four times while Cross was lying on the floor. This occurred on June 8. On the second day, Lockett testified that Moore was involved in the wet towel incident, and in fact said. that all defendants were involved in that activity. Lockett said that after Stinson said he would kill Cross, Moore said "I don't care". Kaminski testified that although Burton and Moore pulled Stinson off while he had been beating Cross, Moore subsequently became involved in the beating of Cross. While Kaminski said that he never saw Moore attack Cross, he had previously told investigating officers that Moore had assaulted Cross. He then testified that he saw Moore attack Cross, and that Moore and Stinson had told him to hit Cross or that he (Kaminski) would get the same thing. Kaminski, however, then equivocated on his testimony, and said that he never saw Moore physically or sexually assault Cross, and that all three defendants, rather than just Moore, had told Kaminski to hit Cross.

Michael Crawford, an inmate of ward 219, testified that Moore and Cross got into a fight on the night of June 8, but said that he never saw the fight. He did say that he heard Stinson and Burton tell Moore to leave Cross alone. Ronald Bousquette, an inmate of ward 218, testified that after Cross came into the jail, Moore began beating Cross with his fists. On the second evening, after Stinson had beat Cross and Cross had been placed on his bunk, Moore kicked Cross in the back of the head. Cross then "spit up some white slime" and remained in his bunk until he was taken to the hospital.

*Evidence Against Burton:* Lockett testified that Burton, as well as the other defendants, beat Cross

with wet towels. Kaminski also testified that Burton was involved in the wet towel incident, and whipped Cross all over his body. He said that this incident lasted for about 30 minutes. The remainder of Kaminski's testimony regarding Burton was that Burton and Moore pulled Stinson off Cross, and that Burton called for the deputy after Cross seemed to be quite ill. Crawford testified that Burton kept telling Moore not to hit Cross.

Bousquette testified that on the morning of June 9, after breakfast, Burton discovered that he was missing some cigarettes. Apparently Stinson was also missing a small cake, and Burton and Stinson "held court" on Cross regarding the smoking of Burton's cigarettes and the eating of Stinson's cake. Cross admitted doing both deeds, and Stinson and Burton beat Cross. Bousquette testified that Burton beat Cross with his fist for a few minutes, striking Cross's head and chest. Cross was trying to get away, and Burton kept hitting him. Later, Stinson and Burton beat Cross with wet towels.

Examining the evidence in a light most favorable to the people, we conclude that there was sufficient circumstantial and direct evidence against all three defendants on each element of the offense of second-degree murder. It seems clear that Stinson was the "ringleader" in this morbid enterprise, and participated in most of the beatings which led to death. Moore was an active participant, with his kick to the head of Cross while Cross was lying upon his bunk, constituting a particularly incriminating factor. Finally, Burton, against whom the least amount of testimony was presented, did strike Cross with his fist, participated in the towel beating incident which extended for 30 minutes and "held court" after Cross had taken his cigarettes. We find that the evidence

was sufficient to allow a jury to infer, from the total circumstances involved herein, that defendants committed acts exhibiting an intent to kill Cross or an intent to cause a harm of a similar general nature, done in a wilful and wanton disregard of the likelihood that such harm would result. The various beatings were inflicted over a two-day period, and seemed particularly brutal and severe in light of the fact that Cross was assailed many times when he was lying either upon the floor or his bunk. Thus, we find that the trial court properly denied defendants' motion for directed verdict, and that the charge of second-degree murder was properly submitted to the jury.

Defendant Stinson also argues that the evidence was insufficient to prove sodomy, and that the trial court should have granted his motion for a directed verdict on this charge. Specifically, defendant argues that there was no proof of penetration. According to MCLA 750.159; MSA 28.356, "any penetration, however, slight", was sufficient to establish the offense of sodomy. Although, unfortunately, we lack testimony from the victim, we find that the testimony elicited from Lockett and Kaminski, particularly the latter's statement that he saw Stinson insert his penis into Cross's rectum, to be particularly persuasive and there was indeed evidence sufficient to allow this charge to go to the jury. Also, Bousquette gave an adequate description of the acts involved, and despite his later recantation that he was unable to determine whether there was penetration, we find that the evidence was sufficient to allow this question to go to the jury.

Defendants' argument that the trial court failed to adequately explain the law of aiding and abetting as applied to the lesser offense of manslaugh-

ter is without merit. At trial, defense counsel merely objected to the giving of an aiding and abetting instruction on the grounds that the evidence was insufficient to support such a charge. There was no request that the trial court specifically relate aiding and abetting to the charge of manslaughter, nor was there an objection on the grounds of the trial court's failure to do so. In such a situation, our Court generally finds that such objections have not been preserved for appellate review. *People v Spaulding,* 42 Mich App 492, 496; 202 NW2d 450 (1972), *lv den,* 388 Mich 809 (1972); GCR 1963, 516.2. We have examined the instructions at issue, and determine that they quite properly explained to the jury the law on aiding and abetting. MCLA 767.39; MSA 28.979. See *People v McClary,* 50 Mich App 506, 509; 213 NW2d 562 (1973). This instruction did not result in a manifest injustice to defendants.

Next, defendants argue that the trial court erred by failing to instruct the jury that extra-judicial statements made by witnesses were to be used only for impeachment purposes. During trial, witness Kleckley presented testimony which was less than helpful to the prosecutor, saying that he did not hear what defendants had previously said to deceased. The people then moved to have Kleckley declared a hostile witness, and he was then shown, out of the presence of the jury, the statement he had previously given to a sheriff's deputy regarding the activities which occurred on the night in question. Subsequent to having his memory refreshed, Kleckley testified to events at issue, and was asked by both defense counsel and the prosecutor about the previous statement made to the deputy. His credibility was not impeached, but rather, his memory was refreshed and the court

had no duty to give the instruction at issue. See *People v Holliday,* 44 Mich App 210, 212–213; 205 NW2d 93 (1972), *lv den,* 391 Mich 766 (1974).

When Lockett was called to the stand, he stated "I ain't giving no testimony". The jury was excused, and Lockett was shown a statement he had previously given to the police. He stated that this refreshed his memory as to what he had told the police officer, but then stated that he did not remember anything. Subsequently, the jury returned to the courtroom, and Lockett was occasionally questioned as to his prior statement. Although the statement was used to refresh Lockett's recollection, it was also used to impeach his credibility. We note that questions relating to Lockett's prior statement were generally confined to the sodomy charge, and only two questions related to the towel-beating incident. We have previously seen that there was ample evidence presented on that point, and the error, if any, in the trial court's failure to give the jury a limited instruction would be harmless so far as the murder charge was concerned. Thus, we confine our discussion of this issue to the sodomy charge.

Subsequent to the above testimony, defense counsel requested the trial court to instruct the jury that the extra-judicial statements should be only used to impeach the witness's credibility, and not be used as substantive evidence. The trial judge said that he would cover this point in his general instructions. However, the trial court failed to give this limiting instruction at the end of trial. Defense counsel failed to renew his request before the jury was instructed, and voiced no objection to the trial court's failure to instruct. *People v Harrell,* 54 Mich App 544, 563; 221 NW2d 411, 417 (1974) recently held:

"In the absence of a proper request or objection, the trial court's failure to give the limiting instruction is not reversible error. *People v DerMartzex,* 390 Mich 410; 213 NW2d 97 (1972)."

Assuming, arguendo, that defendant Stinson had preserved this question for appellate review, *People v Charron,* 54 Mich App 26, 34; 220 NW2d 216, 219 (1974), the trial court's failure to caution the jury was harmless error in light of the other evidence of sodomy.[1] The prosecutor, in his closing argument did not specifically refer to this impeachment testimony as showing Stinson's guilt in the sodomy matter, and we cannot say that on the basis of this record that Stinson was denied a fair trial. See *People v Paul Mathis,* 55 Mich App 694, 697; 223 NW2d 310 (1974).

Previous to the selection of the jury, defense counsel requested discovery of the prosecutor's "jury slips". These apparently contained information on prospective jurors who had sat on other cases or who had been excused either peremptorily or for cause. This information was apparently compiled by members of the prosecutor's staff in other trials. At first, defense counsel stated that he was not opposed to the prosecutor using the slips but that defendants would like to have that information available. He argued that fairness required that defendants be entitled to use that information also. After the prosecutor replied that this information was a request for the "work product" of the attorneys on the prosecutor's staff, defense counsel argued that if defendants were precluded from access to this information, the trial court

---

[1] To the extent that *People v Charron, supra,* holds, if indeed it does so hold, that the trial court's failure to give a cautionary instruction previously promised by the court is error, even in the absence of reminder or objection by defense counsel, this panel disagrees. See dissenting opinion of Judge V. J. Brennan, 54 Mich App 37.

should order the prosecutor not to use it also. However, the trial judge ruled that this information represented the work product of the attorneys on the prosecutor's staff and denied defense counsel's request for this information. On appeal, defendants argue that this is prejudicial error in that it improperly allowed the prosecutor to seek a "convicting jury". The people have responded that defendants' argument is precluded by the unpublished per curiam opinion of *People v Stowers,* Docket No. 15727, released August 1, 1973.

The voting records of prospective jurors would undoubtedly be very valuable to trial counsel, and *People v Aldridge,* 47 Mich App 639; 209 NW2d 796 (1973), supports defendants' argument that the trial court erred when it precluded discovery of such information. On the other hand, Judge DAN-HOF dissented, noted that the issue should properly be resolved by the promulgation of a court rule, and agreed with the decision of *United States v Falange,* 426 F2d 930, 932–933 (CA 2 1970), *cert den,* 400 US 906; 91 S Ct 149; 27 L Ed 2d 144 (1970), in which it was stated, among other things, that the court's focus on such an issue is, "can it be said that the jury which was sworn was prejudiced against the defendants". 47 Mich App 639, 652–653; 209 NW2d 796, 802–803 (1973).

At the outset, we note that *Commonwealth v Smith,* 350 Mass 600, 603–604; 215 NE2d 897, 901 (1966), upon which the majority in *Aldridge, supra,* placed much reliance, 47 Mich App 639, 647–648; 209 NW2d 796, 800–801, said that while the information gathered by the police should be available to both sides, "[t]he subject could appropriately be dealt with in a rule of Court". We align ourselves with Judge DANHOF in this suggestion and on the merits of the question, and find that the record

fails to disclose that the jury which was impaneled was prejudiced against defendants.[2]

We should also point out that GCR 1963, 510.1, provides a form for a "Juror Personal History Questionnaire". Questions 28–31 ask whether the juror had ever served as a juror, when and in what courts, whether the juror had ever been discharged from jury service, and if so, the cause of that discharge. GCR 1963, 510.3(1), provides that the completed questionnaire is to be filed with the court clerk, and 510.3(1)(c) and 510.4 allows attorneys to examine the questionnaire for use and assistance in challenging prospective jurors. See 2 Honigman & Hawkins, Mich Court Rules Anno, Author's Comments, p 457. It is our understanding that the same or similar questionnaires are used in Recorder's Court, and are available for counsel's examination. We are unpersuaded that defendants were prejudiced to the extent of having been denied a fair trial, and find no manifest injustice resulting from the trial court's denial of defendants' request. MCLA 769.26; MSA 28.1096.

Defendants' argument that the trial court's jury instruction on malice aforethought and intent were misleading and erroneous, although capably argued, is without merit. The trial court's instructions comported with Michigan case law. *People v Hansen,* 368 Mich 344, 350–351; 118 NW2d 422 (1962); *People v Moorin,* 31 Mich App 301, 310–311; 187 NW2d 434 (1971), *lv den,* 385 Mich 775 (1971). The trial court correctly told the jury that

---

[2] The voir dire, which occurred the afternoon of October 24, all of October 25 and the morning of October 26, 1962, was not transcribed by the court reporter, and appellate counsel, in his well-argued brief, has failed to convince us that the jurors were prejudiced against defendants. *Aldridge, supra,* noted that "the right of disclosure is [not] absolute," and in fact looked to the record to see if defendants had been denied a fair trial. 47 Mich App 639, 649–651; 209 NW2d 796, 801–802.

the difference between second-degree murder and manslaughter is the presence of malice afore-thought in the former and its absence in the latter. *People v Townes,* 391 Mich 578, 589; 218 NW2d 136 (1974).

Defendant's final argument is that reversible error was committed when their motion to quash the information on the basis that the elements of second-degree murder were not established at the preliminary examination was denied. According to MCLA 766.13; MSA 28.931, an examining magistrate is to bind a defendant over for trial if the magistrate determines that an offense has been committed and that there is probable cause to believe that defendant committed it. Neither the trial court nor our Court should substitute its judgment for the judgment of the magistrate, except when a clear abuse of the magistrate's discretion has been shown. *People v Sparks,* 53 Mich App 452, 456; 220 NW2d 153 (1974), *lv den,* 393 Mich 135 (1974). See also *People v Szczytko,* 40 Mich App 161, 167; 198 NW2d 740 (1972), *aff'd,* 390 Mich 278; 212 NW2d 211 (1973).

The Court has examined the three volumes of transcript of the preliminary examination, and finds that there has been no clear abuse of discretion in the determination that a crime was committed and there was probable cause to believe that defendants committed that crime. The death of Harold Cross was established, and medical testimony was presented which indicated that his death was caused by a subdural hemorrhage, which in turn had resulted from a "blunt force trauma" to the head. The deceased was carried from ward 218 to the Detroit General Hospital in an unconscious state, and was pronounced dead on June 11, 1972.

Kaminsky and Bousquette, fellow inmates whose trial testimony has been reviewed previously, presented testimony sufficient to support the magistrate's conclusion that there was probable cause to believe that Stinson, Burton and Moore had committed the crime of second-degree murder. The amount of testimony presented against each defendant was somewhat similar to that which was presented at trial, which we have previously found to have been sufficient to support submission of the case to a jury. Additionally, we note that Bousquette testified that after Cross began to spit up the white fluid and the deputy had been called, all three defendants told the officer that Cross had taken a shower and "fell out in the shower". This evidence came within the admissions exception to the hearsay rule, and constituted "circumstantial evidence of [defendants'] consciousness of guilt * * * ". *McCormick, Evidence* (2d Ed), § 271, p 655. Defendants' motion to quash the information was properly denied.

Affirmed.