## PEOPLE v MAGHZAL

Docket No. 91080. Submitted October 8, 1987, at Detroit. Decided February 5, 1988.

Dunia B. Maghzal was convicted of second-degree murder and possession of a firearm during the commission of a felony following a bench trial in the Macomb Circuit Court, Lawrence P. Zatkoff, J. Defendant appealed alleging that the trial court erred in failing to consider lesser included offenses which were consistent with her defense that the shooting was an accident involving negligence to a greater or lesser degree.

The Court of Appeals *held:*

The facts indicate that the trial court did not consider involuntary manslaughter or manslaughter committed by aiming or pointing a firearm intentionally but without malice. Reversal is therefore required. A factfinder must address the theories argued by the defendant which, as in this case, are supported by the facts.

Reversed and remanded for a new trial.

1. Cʀɪᴍɪɴᴀʟ Lᴀᴡ — Bᴇɴᴄʜ Tʀɪᴀʟ — Fɪɴᴅɪɴɢs ᴏғ Fᴀᴄᴛ.

A trial court sitting without a jury in a criminal case is obligated to make findings of fact.

2. Hᴏᴍɪᴄɪᴅᴇ — Sᴇᴄᴏɴᴅ-Dᴇɢʀᴇᴇ Mᴜʀᴅᴇʀ — Iɴᴛᴇɴᴛ.

A defendant who reasonably believed that the gun he discharged resulting in the death of another was unloaded may be found not to have had sufficient intent to justify a second-degree murder conviction.

3. Cʀɪᴍɪɴᴀʟ Lᴀᴡ — Dᴇғᴇɴᴅᴀɴᴛ's Tʜᴇᴏʀʏ ᴏғ Cᴀsᴇ.

A factfinder must address those theories argued by the defendant which are supported by the facts; the failure to address lesser included offenses supported by the facts requires reversal of the defendant's conviction.

Rᴇғᴇʀᴇɴᴄᴇs
Am Jur 2d, Homicide §§ 41 *et seq.,* 87, 112, 543.
Am Jur 2d, Trial §§ 420-422.
See the Index to Annotations under Homicide; Lesser Included Offenses.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Carl J. Marlinga,* Prosecuting Attorney, *Don L. Milbourn,* Chief Appellate Lawyer, and *Edward L. Graham,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Mardi Crawford*), for defendant on appeal.

Before: HOLBROOK, JR., P.J., and SHEPHERD and D. L. SULLIVAN,* JJ.

PER CURIAM. Defendant was convicted of second-degree murder and possession of a firearm during the commission of a felony in a bench trial in Macomb Circuit Court. She was sentenced to thirteen to twenty-five years on the murder conviction and two years on the felony-firearm conviction.

Defendant and the deceased had been married for some four months at the time of his death. Defendant is an immigrant from Iraq and had received her green card allowing her to be a permanent resident several days before the shooting. Defendant has significant problems with the English language.

The shooting took place on December 19, 1984, at the Sterling Heights home of decedent and defendant. According to a statement given by defendant to the police at 1:00 A.M. that night, decedent had returned home from work late, taken a shower and gone to sleep in the guest bedroom. Defendant was writing Christmas cards in the master bedroom. Defendant later went in to get decedent but he indicated that he would sleep in the guest room because he had already set the alarm clock in that room. The two began to joke, according to defendant, and decedent said that he

---

* Circuit judge, sitting on the Court of Appeals by assignment.

wanted to die. She asked him if he would like her to shoot him and he said yes. She then went to her brother's bedroom and got a .25 caliber automatic weapon. According to defendant, she asked her husband whether the safety was on, took out the clip and told him it was dangerous to point a gun at anyone. Proofs confirm that the clip was pulled before the gun was fired. She placed the gun to decedent's right temple and the gun went off. Defendant told the officer that she and her husband were joking and she did not think the gun was loaded. Proofs confirm that the gun was placed against the skin of decedent's temple.

Immediately after she shot decedent, defendant called a friend in an attempt to locate her brother who was living with decedent and defendant and who owned the gun. She then called decedent's two brothers and they came to the house. Defendant then called the 911 emergency number, indicating that she had shot her husband. By all accounts, defendant was hysterical following the shooting. She repeatedly asked about her husband's condition. She gave a statement to the police officer who drove her back to the station and later gave a taped statement to a detective.

Defendant's brothers testified that defendant and her husband had a good marriage. One of decedent's brothers related one incident of a disagreement between defendant and her husband. He also testified that after she received her green card she had joked that she could now get a divorce. No other evidence of motive was presented.

The trial court found defendant guilty of murder in the second degree. The trial court's findings on the intent element are crucial to our analysis and we therefore quote the trial court at length:

The intent of the Defendant need not be proven directly and in this case it is proven by her acts before and after the killing. Firstly, bearing on intent this Court finds that the Defendant used a dangerous weapon, that is, a handgun. Secondly, this Court takes into consideration the deceased's wounds. This was a contact wound. Dr. Spitz testified and this Court finds that the weapon was pressed firmly against the deceased's right temple. This Court interprets that as being there could be no mistake, no error, that when this gun was discharged the bullet would kill or do great bodily harm to the deceased. In addition, this Court has examined Exhibit Number Seventeen and finds that the clip, that is the cartridge clip, in this weapon was very difficult to remove. It takes two hands to remove this clip and requires some knowledge of guns. Whoever removed the cartridge clip must have had some knowledge or experience with handguns. Although this gun, Exhibit Number Seventeen, has no magazine safety it does have a safety. The safety on Exhibit Number Seventeen locks into the slide of the barrel of this weapon. *Anyone with that level of knowledge or experience to know how to remove the clip from the weapon would also have to know how to operate the safety and would know not to press a gun loaded or unloaded with safety on or off, with the clip in or out, against someone's head and pull the trigger.*

In addition bearing on intent this Court has considered the Defendant's acts after the killing. The Defendant did not call the police or an ambulance immediately. She first placed a call attempting to locate her brother. Secondly, she told her friend when she spoke to her on the phone that her husband had fainted. She didn't ask her friend for assistance, didn't run to the neighbors for assistance. She ignored her friend's earlier suggestion that she call 911 or the emergency number.

She told the police on call number one at 11:37 P.M. that her husband had fallen and that she didn't know what happened. Then she asked one of the deceased's brothers to hide the weapon.

All of the above are consistent with the intent to kill or cause great bodily harm and they are inconsistent with the accident. [Emphasis added.]

The instant case turns on the distinction between second-degree murder, MCL 750.317; MSA 28.549, and involuntary manslaughter, MCL 750.321; MSA 28.553. In *People v Dykhouse,* 418 Mich 488, 508-509; 345 NW2d 150 (1984), the Supreme Court set forth the elements of second-degree murder, as follows:

As refined by this Court, the elements of common-law murder are: (1) a death, (2) caused by an act of the defendant, (3) absent circumstances of justification, excuse, or mitigation, (4) done with an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with the knowledge that the act probably will cause death or great bodily harm. *People v Hansen,* 368 Mich 344, 350-351; 118 NW2d 422 (1962). Common-law murder, as evolved, is what has come to be known as second-degree murder.

The criminal offense of common-law involuntary manslaughter, as codified, requires a death caused by the defendant without legal justification or excuse while the defendant was acting in a grossly negligent manner or while committing an unlawful act which was inherently dangerous to human life. *People v Duggan,* 115 Mich App 269; 320 NW2d 241 (1982). A finding of gross negligence for purposes of involuntary manslaughter requires:

(1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.

(2) Ability to avoid the resulting harm by ordi-

nary care and diligence in the use of the means at hand.

(3) The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another. [*People v Orr*, 243 Mich 300, 307; 220 NW 777 (1928).]

The crime of involuntary manslaughter does not require that the defendant be personally aware of the danger or that he knowingly and consciously create that danger. The test only requires the danger to be apparent to the ordinary mind. *People v Sealy*, 136 Mich App 168; 356 NW2d 614 (1984). [*People v Harris*, 159 Mich App 401, 406; 406 NW2d 307 (1987).]

Further implicated in this case is the statutory felony of manslaughter committed by aiming or pointing a firearm intentionally but without malice, MCL 750.329; MSA 28.561. The distinction between this crime and common-law involuntary manslaughter has been explained this way: "We believe that the legislative intent was to punish the intentional pointing of a firearm which results in death even if the defendant did not act in a grossly negligent manner." *Duggan, supra* at 272.

The general rule appears to be that, when a person points a gun at someone as a joke, reasonably believing the gun not to be loaded, and pulls the trigger and the gun discharges and kills the victim, he is guilty of manslaughter. 40 Am Jur 2d, Homicide, § 95, p 390.

The facts in this case contain the elements of these separate felonies. Defendant claimed that the gun went off while she and decedent were joking. She claimed to know little about guns and thought that when she took the clip out the gun was empty. By all accounts, she seemed hysterical after the shooting. Her story was consistent with

her defense that the shooting was an accident involving negligence to a greater or lesser degree.[1]

The court rules require the judge in a nonjury criminal case to make findings of fact. MCR 2.517; MCR 6.001. *People v Jackson,* 390 Mich 621; 212 NW2d 918 (1973). Review of *Jackson* is here instructive. In that case, defendant and two friends went to an address to purchase drugs. Defendant waited off to the side with a shotgun while his two friends went to the door. A man named Holmes answered the door but refused to do business with the two men, one of whom he did not recognize. One of the men at the door reached into his pocket and Holmes opened fire with a gun. Defendant then fired his gun, striking and killing one of his associates, not Holmes. At trial, defendant claimed self-defense.

The Supreme Court held, inter alia, that a trial court sitting without a jury is obligated to make findings of fact. In *Jackson,* the trial court commented to defendant's attorney that he could not see self-defense since the decedent had no gun. His final ruling did not indicate how he resolved this and other questions troubling him. The Supreme Court remanded because there was "sufficient doubt" as to whether the trial court had correctly applied the law to the facts.

In this case, the trial judge, after examining the gun and concluding that anyone who could get the clip out must have been knowledgeable about guns, concluded:

> *Anyone* with that level of knowledge or experience to know how to remove the clip from the

---

[1] Defendant presented no expert witness to testify as to whether the gun could have simply gone off absent pressure on the trigger. Detective Blanchard, the investigating detective in this case, testified that the gun could not go off without such pressure. We therefore assume that defendant does not deny pulling the trigger.

weapon *would also have to know* how to operate the safety and *would know* not to press a gun loaded or *unloaded* with safety *on or off,* with the clip in or out, against someone's head and pull the trigger. [Emphasis added.]

We are not convinced that everyone who reasonably believes that a gun is empty necessarily has sufficient intent to justify a second-degree murder conviction. Also, we find the trial court's failure to specifically address involuntary manslaughter and the lesser statutory manslaughter committed by aiming a gun casts sufficient doubt as to whether the trial court properly applied the law to the facts in this case. We find from the trial judge's comments that he did not consider options other than second-degree murder and that he erroneously believed that, under the facts, second-degree murder was the only possibility. The present case is analogous to those cases in which the jury was not instructed as to lesser offenses. See *People v Ora Jones,* 395 Mich 379, 394; 236 NW2d 461 (1975). In this case, the trial judge's failure to consider the lesser offenses requires reversal. See *Jones;* see also *Jackson.* The defense theory was accidental shooting; defense counsel argued the two lesser offenses in closing argument. We rule that the factfinder must address those theories argued by defendant and which were supported by the facts. We reverse defendant's conviction and remand for a new trial because the trial court, sitting as factfinder, failed to address the possibility of the lesser included offenses.

We further hold that defendant's other allegations of error requiring reversal are meritless. Defendant's brother-in-law was questioned as to marital problems between defendant and the victim in a series of leading questions. Defendant's

brother-in-law had some difficulty with the English language. The only "problem" he could identify was a joke defendant made about being able to get a divorce shortly after receiving her green card. The decision whether to permit leading questions is within the discretion of the trial court. *People v Garland,* 152 Mich App 301; 393 NW2d 896 (1986). Given the witness' significant language barrier, we find no abuse.

Defendant also objects to testimony by an investigating officer that it "appeared to me that the victim may possibly have been sleeping at the time of the incident." Defendant cites no authority for the proposition that this testimony was error. It is not the job of the appellate court to find support for defendant's case. *People v Battle,* 161 Mich App 99; 409 NW2d 739 (1987). In any event, the comment was made in the context of the officer's observations of the victim, which included the fact that the victim had his eyes closed, was in his underwear, and that there was no indication of a struggle. We find no error.

Finally we note that defendant is an alien who upon release following a felony conviction and absent a recommendation otherwise by the trial court is subject to deportation. 8 USC 1251. Since we have vacated defendant's conviction here and remanded for a new trial, defendant may address the trial court on the issue at the appropriate time under the federal statute.

Reversed and remanded. We do not retain jurisdiction.[2]

---

[2] Since this was a bench trial, we would normally have remanded for further fact-finding on the present record. However, the trial judge is no longer on the Macomb Circuit bench, having recently been appointed to the United States District Court.