# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RILEY ANDREW SPITLER,

        Defendant-Appellant.

UNPUBLISHED
June 20, 2017

No. 331962
Jackson Circuit Court
LC No. 14-005198-FJ

Before: SWARTZLE, P.J., and SAAD and O'CONNELL, JJ.

PER CURIAM.

Defendant, Riley Spitler, shot his older brother, Patrick Spitler, in the chest at his home in Blackman Township, killing him nearly instantaneously. Defendant claimed that the shooting was an accident, and that he believed the gun to be unloaded at the time of the killing. The prosecution disagreed, arguing that the killing was not only intentional, but premeditated, and charged defendant with open murder, MCL 750.316. During the investigation of the killing, police also uncovered evidence of defendant's dealing marijuana and the prosecution charged defendant accordingly. MCL 333.7401(2)(d)(*iii*). The prosecution also charged defendant with possessing a firearm during the commission of both offenses (felony firearm). MCL 750.227b.

At defendant's jury trial, the trial court improperly admitted testimony from a detective presented as an expert in "linguistic statement analysis" without properly determining that his testimony was based upon "reliable principles and methods" as required by MRE 702. The trial court also improperly admitted hearsay statements from three of the victim's friends under exceptions for present sense impression, MRE 803(1), excited utterance, MRE 803(2), as well as the residual hearsay exception, MRE 803(24). A jury found defendant guilty of second-degree murder, MCL 750.317, delivering the controlled substance of marijuana, MCL 333.7401(2)(d)(*iii*), and two counts of possession of a firearm during commission of a felony, MCL 750.227b.

We now vacate defendant's conviction for second-degree murder and remand for proceedings consistent with this opinion. We affirm defendant's controlled substance conviction and the related felony firearm conviction as defendant has shown no error undermining the reliability of those convictions.

-1-

# I. BACKGROUND

All parties agree that, on December 6, 2014, defendant, then 16 years old, shot his older brother in the chest, perforating his heart, and killing him nearly instantaneously. Defendant then called 911 for assistance. When police officers arrived at the home, defendant met them outside and hysterically told them, "I shot my brother and I think he's dead." These officers noticed a broken glass entry door and that defendant's hand was bloody.

Defendant's distress continued as he was placed in the back of a police cruiser to the point where he was shaking the car and police became concerned for his safety. Defendant repeatedly questioned police about his brother's health. Eventually, defendant was transported to a local hospital to treat his injuries. Defendant's emergency room physician testified that defendant "told us he was playing around with his mother's gun and said he was just joking around and he told his brother, 'Let's see if this is your lucky day,' and he said he pulled the trigger at that point." The physician continued that defendant "also told us he was not sure if the gun was loaded until after he fired the gun." Defendant indicated to the physician that he had punched the glass out of the door so that emergency personnel could enter the home and that he was so distressed by the incident that he wished to commit suicide.

Police searched the home and found several guns in defendant's bedroom, including the apparent murder weapon. Patrick was found dead in his room, where police recovered a spent shell casing. In defendant's room, police also found a mason jar containing marijuana.

It appears that Child Protective Services (CPS) became involved in this case after defendant's parents declined to place defendant in a mental health treatment facility. One CPS case worker, Alexandria Fedewa, interviewed defendant and testified that he told her that he and Patrick were playing Russian Roulette and that he did not know there was a round in the chamber. According to Fedewa, defendant told her that "he doesn't know how to feel guilt" and that "life is a process" and "death is a part of it." Fedewa also indicated that defendant dropped out of school in ninth grade and that "money is really all he cares about."

Another CPS worker, Becky Malin, interviewed defendant and he told her that Patrick had actually fired the gun. Malin continued that, when she attempted to discuss his brother's death, defendant gave her an "empty," "uncontrollable" look that made her concerned for her own safety. Malin also indicated that defendant told her that he had been selling marijuana with his neighbor, Kantpreet Singh. Singh was called to testify but asserted his Fifth Amendment rights. Detective Boulter testified regarding Facebook messages between Singh and defendant, in which the two discussed selling various drugs, including marijuana, and profiting from the enterprise.

At trial, the prosecution asked to qualify Detective Joseph Merritt as an expert in linguistic statement analysis (LSA) and provided defense counsel, for the first time, with

Merritt's curriculum vitae. Over defendant's objection, and without a *Daubert*[1] hearing, the trial court admitted Merritt as an expert.

Detective Merritt explained that LSA is a technique sanctioned by the Michigan Commission on Law Enforcement Standards (MCOLES) to evaluate an individual's statement to determine whether the statement contains "indicators of deception." Detective Merritt testified that he interviewed defendant and analyzed defendant's call to 911. Portions of the interview were played for the jury and Merritt explained the statements that he found concerning. Among the areas that concerned Detective Merritt were that defendant stated that he had a working knowledge of semiautomatic firearms, that defendant looked "relaxed" when he described the shooting, and that defendant asked whether the magazine in the recovered firearm was "seated" or "slightly dislodged."[2]

Regarding the 911 call, Detective Merritt testified that what was "most striking" to him was that defendant did not seek help for Patrick, but rather waited three minutes into the call to tell the operator that Patrick was "still breathing." Detective Merritt also found concerning defendant's repeated acceptance of death, as allegedly evidenced by his statements to the operator.

A manager from a local sporting goods store testified at trial that defendant attempted to purchase a handgun from the store through his mother. The manager testified that he refused to sell the gun to defendant's mother, but that defendant's mother eventually purchased the apparent murder weapon from the store. Three of Patrick's friends—Kalyn Madery, Dalton Dueck, and Joshua Foote—also testified for the prosecution about statements Patrick had made to them about defendant having a gun. Defendant objected to two of these statements. The trial court overruled defendant's objections, concluding that the statements were admissible as either present sense impressions, excited utterances, or under the residual hearsay exception.

## II. APPLICABLE STANDARDS

This Court reviews a "trial court's decision to either admit or exclude evidence" for an abuse of discretion. *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). We also review questions regarding a trial court's determination of a witness's qualification as an expert for an abuse of discretion. *People v Gambrell*, 429 Mich 401, 407; 415 NW2d 202 (1987). A trial court abuses it discretion when its decision falls outside the principled range of outcomes. *People v Carnicom*, 272 Mich App 614, 617; 727 NW2d 399 (2006).

In criminal cases, whether an error occurred is not dispositive of whether a defendant is entitled to a new trial. Rather, under the harmless error standard, "[n]o judgment or verdict shall be set aside . . . unless in the opinion of the court, after an examination of the entire case, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[2] Defendant told Merritt that a gun will not fire if the magazine is not fully seated.

769.26. Put another way, defendant is not entitled to relief unless he establishes that, "more probably than not, a miscarriage of justice occurred because of the error," i.e., that the error was outcome determinative. *People v Knapp*, 244 Mich App 361, 378; 524 NW2d 227 (2001). Still, "a reviewing court is not to find [an] error harmless simply because it concludes the jury reached the right result." *People v Mateo*, 453 Mich 203, 206; 551 NW2d 891 (1996). Moreover, the cumulative effect of several errors, although harmless in isolation, may render the verdict unreliable and warrant relief. *People v. Ackerman*, 257 Mich App 434, 454; 257 NW2d 818 (2003).

## III. ANALYSIS

*Violation of* Daubert/*MRE 702.* Defendant first argues that Detective Merritt's LSA testimony was inadmissible because its reliability was not verified, and that the trial court should have held a *Daubert* hearing to determine LSA's reliability. We agree.

"[T]rial courts have an obligation to exercise their discretion as a gatekeeper and ensure that any expert testimony admitted at trial is reliable." *People v Yost*, 278 Mich App 341, 394; 749 NW2d 753 (2008). MRE 702 governs the trial court's certification of experts and admission of expert testimony. The rule provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702.[3]]

An expert's opinion is not objectionable merely because it embraces an ultimate issue decided by the factfinder. MRE 704. Accordingly, "MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007) (internal quotation notation and citation omitted). To qualify as expert testimony under MRE 702, the witness's testimony must not only be viewed as legitimate within the witness's field of expertise, but the field of expertise itself must also be based upon the "methods and procedures of science." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting *Daubert*, 509 US at 589-590.

Ultimately, the trial court must determine that the expert's opinion is based upon reliable principles and methodology rather than " 'unsupported speculation.' " *Unger*, 278 Mich App at 217, quoting *Daubert*, 209 US at 590. "When evaluating the reliability of a scientific theory or

---

[3] MRE 702 incorporates the "requirements of the United States Supreme Court's decision in [*Daubert*, 509 US 579]." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008)

technique, courts consider certain factors, including but not limited to whether the theory has been or can be tested, whether it has been published and peer-reviewed, its level of general acceptance, and its rate of error if known." *People v Kowalski*, 492 Mich 106, 131; 821 NW2d 14 (2012).

In cases where the challenged field, expert, or procedures are not generally accepted, the trial court may need to hold a separate hearing outside of the presence of the jury to determine whether the proposed opinion meets the standards of admissibility. See *Unger,* 278 Mich App at 218. Such a hearing is often referred to as a *Daubert* hearing.

In this case, the trial court did not hold a *Daubert* hearing to determine the reliability of LSA. Indeed, the trial court merely accepted Detective Merritt's qualifications without requiring the prosecution to introduce any evidence demonstrating LSA's reliability save for the fact that MCOLES approved the procedure for use in investigative police work.[4] Rather, the trial court admitted Merritt as an expert, allowed the jury to hear his opinion, and denied defendant's post-conviction request for a *Daubert* hearing, indicating that "the matter should be properly considered by the appellate courts." Yet, in so ruling, the trial court misplaced the responsibility for ensuring that MRE 702 is satisfied. It is the trial court's obligation to conduct a searching inquiry into the reliability of scientific techniques under MRE 702.

For our part, we can find nothing in our case law to support the trial court's ruling. The prosecution has provided this Court with no case indicating that LSA is an accepted or reliable technique. Further, we are unable to find any case in which LSA has been subjected to a *Daubert*-type analysis or been properly admitted as supporting an expert's opinion. Apart from its authorized use as an investigative tool by MCOLES, we are unable to find anything in the record or precedent to support the use of LSA in defendant's trial.

*The Trial Court Improperly Admitted Hearsay Evidence.* In addition to the MRE702/*Daubert* error, defendant also argues that the trial court improperly admitted three instances of hearsay testimony. We agree.

"'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay is generally prohibited and may only be admitted at trial if provided for in an exception to the hearsay rule." *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010); MRE 802.

At trial, Kalyn Madery testified that approximately two months before the fatal shooting, Patrick "confided in me that [defendant] had pulled out a gun on him in some type of argument

---

[4] We note that, whether the technique has been approved for investigative police work is a separate question, insufficient to determine whether the technique is sufficiently reliable to be used as the basis of an expert opinion at trial. Polygraph tests have long held the favor of some police departments; nevertheless, the reliability of these tests has not been sufficiently established to render them admissible as evidence. See *People v Barabara*, 400 Mich 352, 404-405; 255 NW2d 171 (1977).

in an angry way. He was just talking about being worried, being concerned not knowing what to do." Next, Dalton Dueck explained that Patrick had told him earlier "[t]hat his brother had kind of told him a secret about having a gun and Patrick was pretty shocked by that . . . and concerned." Finally, Joshua Foote testified in part that, on the day before Patrick died, Patrick pulled him aside and stated that defendant had a gun. Foote added that he "thought this . . . is a big deal. And . . . I could tell [Patrick] did too."

This testimony plainly included hearsay statements. The trial court held an evidentiary hearing regarding, inter alia, the challenged statements. The trial court admitted Madery's testimony under the excited utterance exception, Duecke's testimony under the excited utterance and present sense impression exceptions, and Foote's testimony as an excited utterance, but also indicated that it may be admissible as a present sense impression and under the residual hearsay exception. We conclude, however, that none of these exceptions applied and that the trial court improperly admitted the statements.

For a trial court to admit hearsay evidence under the excited utterance exception, the statement must relate to a "startling event or condition" and be made "while the declarant was under the stress of excitement caused by the event or condition." MRE 803(2). The key issue is whether the declarant was still under the stress of excitement caused by the startling event when the declarant made the statement or whether the declarant had an opportunity for "conscious reflection." *People v Smith*, 456 Mich 543, 550-551; 581 NW2d 654 (1998).

Here, the exact time relationship between defendant allegedly showing Patrick a gun or telling him that he had one and the statements Patrick allegedly made to his friends is unclear. The record, however, indicates that the witnesses did not speak with Patrick immediately after defendant allegedly showed Patrick the gun or otherwise threatened him. For example, Madery testified that Patrick told her about defendant's gun while she and Patrick were in a coffee shop and after the two had spent the night taking pictures around Jackson. Madery testified that her impression was that the incident Patrick told her about occurred approximately one week before Patrick confided in her. Similarly, the record shows that Patrick's other alleged statements were made an appreciable time after the startling event, and from a place of relative safety, allowing Patrick the opportunity for conscious reflection, such that Patrick would no longer have been under the stress of the excitement caused by the event. Accordingly, we conclude that the hearsay statements do not qualify under the excited utterance exception.

Similarly, the statements do not qualify under the present sense impression exception. A present sense impression is a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." MRE 803(1). The record indicates that Patrick did not make these statements while he was witnessing his brother show him a gun, or immediately after. Accordingly, the statements were not admissible as present sense impressions.

Finally, the record does not support the conclusion that the statements were admissible under the residual hearsay exception. "To be admitted under MRE 803(24), a hearsay statement must: (1) demonstrate circumstantial guarantees of trustworthiness equivalent to the categorical exceptions, (2) be relevant to a material fact, (3) be the most probative evidence of that fact

reasonably available, and (4) serve the interests of justice by its admission." *People v Katt*, 468 Mich 272, 290; 662 NW2d 12 (2003).

The trial court did not provide a reasoned analysis explaining why these statements each satisfied MRE 803(24), and based on this record we cannot determine whether the testimony was the most probative evidence of defendant's statement of mind, among other things at issue in the trial.

*Character Evidence Was Proper.*   Finally, defendant argues that the trial court improperly admitted character evidence in the form of (1) caseworker Fedewa's testimony that defendant dropped out of school in ninth grade and only cared about money, (2) caseworker Malin's testimony that she was frightened by defendant, and (3) testimony regarding the Facebook conversations between defendant and Singh.  We find no error here.

"Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith."   MRE 404(a).   Moreover, evidence of a person's "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."   MRE 404(b)(1). This evidence, however, is admissible for other purposes and may provide "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case."   MRE 404(b)(1).

Moreover, character evidence may also be admissible when a witness, including a defendant, places a character trait at issue, though "the power of the state to rebut the character of defendant is limited to the trait or traits introduced by the defendant."   *People v Johnson*, 409 Mich 552, 561; 297 NW2d 115; MRE 404(a)(1).   If character evidence is admissible, "proof may be made by testimony as to reputation or by testimony in the form of an opinion.  On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct."   MRE 405(a).

Here, caseworker Fedewa's testimony regarding defendant's dropping out of school and focus on money tended to establish defendant's motivation for selling marijuana as a means to acquire more money.  Accordingly, the statement was admissible under MRE 404(b)(1).

Caseworker Malin's testimony that she did not feel safe around defendant was elicited on redirect after defense counsel asked her if she had described defendant "as a very nice young man," and what change had occurred in defendant when she asked him about the incident.  This questioning placed defendant's character at issue and rendered proper the prosecution's subsequent questioning on defendant's character.

The Facebook messages are more properly characterized as direct evidence of defendant's distribution of a controlled substance and possession of a firearm for purposes of that crime, rather than character evidence.

Accordingly, we conclude that the trial court did not improperly admit evidence of defendant's character or prior bad acts.

## IV. RELIEF

Because defendant has shown error with respect to the trial court's admission of scientific evidence, as well as its admission of hearsay statements from three prosecution witnesses, we must now determine whether those errors undermine the reliability of defendant's convictions, such that defendant is warranted relief. We find that defendant is warranted relief from his second-degree murder conviction, but not from his controlled substance conviction or the felony-firearm conviction related to that conduct.

On appeal, the prosecution argues that, even if the trial court did err in admitting the challenged evidence, any error was harmless given that Detective Merritt's testimony, as well as the challenged hearsay statements, tended to establish defendant's guilt for first-degree murder, and defendant was ultimately convicted of second-degree murder. We are unable to conclude that these errors were harmless, or, in other words, that the jury verdicts were reliable. *Feezel*, 486 Mich at 192.

In order to convict a defendant of second-degree murder, the prosecution must show beyond a reasonable doubt that the defendant acted with malice. *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* The prosecution contends that defendant's act of pointing a gun at his brother and pulling the trigger is sufficient to conclude, beyond a reasonable doubt, that he willfully disregarded that the natural tendency of that action would be his brother's death. On the present record, we cannot agree.

"The general rule appears to be that, when a person points a gun at someone as a joke, reasonably believing the gun not to be loaded, and pulls the trigger and the gun discharges and kills the victim, he is guilty of manslaughter." *People v Maghzal*, 170 Mich App 340, 345; 437 NW2d 552 (1988), citing 40 Am Jur 2d, Homicide, § 95, p 390. While an appropriate case may exist to find that such an act constitutes a willful disregard for life, "[w]e are not convinced that everyone who reasonably believes that a gun is empty necessarily has sufficient intent to justify a second-degree murder conviction." *Id.* at 347. More specifically, we have not been presented with any argument sufficient for us to conclude that this case presents a factual circumstance that warrants departure from the general rule.

Detective Merritt's testimony and the challenged hearsay statements were offered as evidence of defendant's state of mind, and tended to negate his contention that he believed the gun to be unloaded. Defendant's state of mind was one of the dispositive issues at trial, and, given the cumulative effect of these errors, we are unable to conclude that defendant's conviction of second-degree murder is reliable. Accordingly, we reverse the defendant's conviction of second-degree murder.

We agree with the parties that involuntary manslaughter, MCL 750.321, is a lesser-included offense to second-degree murder. See *People v Mendoza*, 468 Mich 527; 664 NW2d 685 (2003). We further agree with the parties that, given our reversal of the second-degree murder conviction, the appropriate remedy is to remand the matter with instructions for the trial court to enter a judgment of conviction for involuntary manslaughter and to resentence defendant

accordingly. See *People v Bearss*, 463 Mich 623, 631; 625 NW2d 10 (2001); *People v Thomas*, 399 Mich 826; 249 NW2d 867 (1977). On remand, if the prosecution is "persuaded that the ends of justice would be better served" by proceeding to trial on the second-degree murder charge, then before resentencing, the prosecution may notify the trial court of that intent. *Thomas*, 399 Mich at 826-827. If the prosecution timely notifies the trial court, then the trial court shall vacate the manslaughter conviction and related felony-firearm conviction and grant a new trial on the second-degree murder charge and related felony-firearm charge. *Id.*

Defendant has not proven any error that relates to—yet alone undermines the reliability of—his conviction for distributing a controlled substance or the related felony firearm conviction. We therefore affirm those convictions.

We do not retain jurisdiction.


/s/ Brock A. Swartzle
/s/ Henry William Saad
/s/ Peter D. O'Connell